Sherman v. State.

JOHN W. SHERMAN *v.* STATE.
(*Knoxville.* September Term, 1911.)

1. **MURDER IN THE SECOND DEGREE.** Evidence sufficient to sustain conviction.

The evidence is stated, reviewed, and held to be sufficient to sustain a conviction of murder in the second degree. (*Post, pp.* 23-46, 60, 62.)

2. **CRIMINAL LAW.** Previous threats and acts of hostility do not constitute grounds of self-defense, when.

No matter how violent previous threats or acts of hostility against a defendant may be, they will not of themselves justify him in seeking and slaying his adversary upon the assumption that it is necessary to do so in order to save his life from the threatened danger; for to excuse the slayer, he must act upon an honest belief that it is necessary at the time to take the life of his adversary in order to save his own, and it must appear that there was a reasonable cause to excite this apprehension. (*Post, pp.* 43-46.)

Cases cited and approved:  Rippy v. State, 2 Head, 217; Williams v. State, 3 Heisk., 376; Jackson v. State, 6 Bax., 457.

3. **ARGUMENT OF COUNSEL.** Can afford no ground for new trial where no objection was made or exception taken at the time.

Objectionable argument or improper remarks of counsel afford no ground for a new trial where no objection is made or exception taken at the time of the argument; and the same rule applies with equal force to gestures and the other conduct of counsel indulged in during argument. (*Post, pp.* 47, 53.)

Cases cited and approved:  Smith v. State, 90 Tenn., 574; King v. State, 91 Tenn., 617; Morgan v. Duffey, 94 Tenn., 686; Ferguson v. Moore, 98 Tenn., 341.

4. **SAME. Truth of improper argument and fact of exceptions thereto must be authenticated in bill of exceptions; inclusion of written motion for new trial so alleging or charging does not establish the truth or fact.**

The question whether or not due exception was taken to the objectionable argument or improper conduct of the State's attorney is one of fact. A charge or allegation of such matter in a motion for a new trial is not evidence of the matter; and it is not sufficient to make such charges, but the charges must be authenticated or established in a proper way. The mere fact that the written grounds of a motion for a new trial are included in the bill of exceptions constitutes no verification of the statements made in such motion; for such inclusion in a bill of exceptions only establishes that the statements or allegations were made on the motion, not that they are true. (*Post*, *pp.* 48, 49.)

5. **NEW TRIALS. Facts and what transpired on trial cannot be established by affidavits upon motion for a new trial, but must be authenticated by trial judge in bill of exceptions.**

It is a well settled rule of practice that an uncorroborated affidavit of a convicted defendant will not sufficiently establish any fact on a motion for a new trial, so as to justify the granting of a new trial thereupon; and what transpired on the trial cannot be established by the affidavits of the convicted defendant or his attorneys; for such matter must be authenticated by the trial judge, properly in narrative form in the bill of exceptions, and the fact of what was said and done in argument and the exceptions thereto can not be established by such affidavits, but must be authenticated by the trial judge in the bill of exceptions. (*Post*, *pp.* 49-53.)

Cases cited and approved: Turner v. State, 4 Lea, 209; Brown v. State, 85 Tenn., 439; Hannum v. State, 90 Tenn., 652, 653.

Sherman v. State.

6. **SAME.   Not granted for separation of jury in a criminal case where it is fully and satisfactorily shown that no prejudicial communication was had with them.**

A separation of the jury in a criminal trial may be explained by showing that those separated had no communication with other persons, or that such communication was upon subjects foreign to the trial, and where every circumstance and surrounding of the jurors while separated is fully and satisfactorily explained in so far as their contact with others is concerned, and it is shown that no communication was had with them in any wise reflecting upon the case on trial before them, a new trial will not be granted upon the ground of such separation. (*Post, pp.* 53-58, 60, 62.)

Cases cited, reviewed, and approved: McLain v. State, 10 Yerg., 239; Stone v. State, 4 Humph., 26; Hines v. State, 8 Humph., 597; McElrath .v. State, 2 Swan, 378; Odle v. State, 6 Bax., 159; Cartwright v. State, 12 Lea, 620; King v. State, 91 Tenn., 617.

7. **SAME.   Same.   Separation of jury in taking a walk, going to see a furnace, or going to a show constitutes no ground for a new trial, when; case in judgment.**

A separation of the jury by some of them taking a walk with an officer through the streets, while the others, with another officer, remained at the hotel; by some of them visiting a furnace, while the others stayed at the hotel, an officer being with each party, or set of separated jurors; or by some of them going, in charge of an officer, to a theater, while the others remained at the hotel in charge of another officer, constitutes no ground for a new trial of a criminal case, where it is fully and satisfactorily shown that no prejudicial communication was had with the separated jurors, and nothing occurred reflecting upon the case. (*Post, pp.* 53-62.)

See citation of cases under the preceding headnote.

8. **SAME.   Findings of fact by trial judge on motion for a new .trial are binding upon the supreme court.**

Sherman v. State.

It is an established rule that the findings of fact made by the trial judge on a motion for a new trial, where there is any evidence to sustain them, are binding upon the supreme court, even in criminal cases. (*Post, p.* 60.)

Case cited and approved: Percer v. State, 118 Tenn., 765 (and citations).

9. **CRIMINAL PROCEDURE.** Officers permitting separation of jury and jurors separating from body of jury should be fined and punished.

·The conduct of officers in permitting the separation of the jury is reprehensible, and such officers so offending and the jurors separating from the body of the jury should be fined and punished by the trial judge, though there was no prejudicial communication or reflection upon the case constituting grounds for a new trial. (*Post, p.* 61.)

10. **NEW TRIALS.** Not for moderate use of intoxicating liquors by some of the jury in a criminal case when no juror is affected by it.

The drinking of intoxicating liquors by some of the jurors while trying a criminal case, when not used to excess but only in moderation, and where no juror became affected thereby, will not vitiate the verdict and constitutes no ground for a new trial. (*Post, p.* 62.)

Cases cited and approved: Stephens v. State, 4 Humph., 26; Roe v. State, 11 Humph., 491; King v. State, 91 Tenn., 617.

FROM HAMILTON.

Appeal in error from the Criminal Court of Hamilton County.—S. D. McREYNOLDS, Judge.

LEWIS SHEPHERD, J. B. FRAZIER, MARTIN FLEMING, and M. H. DOUGHTY, for Sherman.

ATTORNEY-GENERAL CATES and LITTLETON & LITTLETON, for State.

———

MR. JUSTICE GREEN delivered the opinion of the Court.

The plaintiff in error was indicted in the criminal court of Hamilton county for the murder of Tom Norman. He was tried and found guilty of murder in the second degree, and his punishment fixed at ten years in the penitentiary. His motion for a new trial having been overruled, he has brought his case to this court for review.

The deceased was a brother-in-law of the plaintiff in error, the latter being a young physician in the city of Chattanooga. The killing occurred at Norman's store in that city, on February 5, 1911, shortly after noon, Sunday.

There were present in the store at the time of the tragedy, besides Norman himself, only Dr. Sherman and his chauffeur, Buddie Bachman. Buddie Bachman testified for the State and Dr. Sherman in his own behalf. The respective theories of the State and the plaintiff in error are fully stated in the testimony of these two witnesses. The circumstances of the killing can therefore be best presented by a brief resume of the evidence of Dr. Sherman and of Buddie Bachman.

First, referring to the testimony of Dr. Sherman, it appears therefrom that he is a physician about twenty-five years of age, a man of medium stature, but some taller than was his brother-in-law, Norman. Norman was married to Dr. Sherman's sister in 1901 and they had several children.

The elder Sherman, the father of the plaintiff in error and of Mrs. Norman, was a native of Michigan, but removed to Chattanooga about thirty years ago. He was also a physician and appears to have been a man of some business sagacity, as he amassed and left at his death, about two years since, a considerable fortune. Dr. Sherman and Mrs. Norman were his only heirs. It is to be inferred from the statements of Dr. Sherman that his father died intestate and the doctor and his sister and their mother seem to have agreed among themselves that the estate of the elder Sherman should be equally divided among the three. Dr. Sherman qualified as administrator of his father's estate and, according to his testimony and that of his sister and mother, a division appears to have been effected among them without any friction, except that Norman was not pleased with the manner in which the plaintiff in error managed the business and appears to have expressed his disapprobation on frequent occasions.

Dr. Sherman testifies that on the morning of February 5, 1911, he was at the Eagle's Club in Chattanooga when he received a telephone message from his sister to the effect that Tom Norman, her husband, was acting in a

peculiar manner and that she had consulted with her mother and that they wished the doctor to come out. Sherman then telephoned to Buddie Bachman to get his car out of a garage in the city and bring it around to the Eagle's Club for him. He states that he then went to George Beckert's saloon where Bachman found him, and they went to the home of his mother on the corner of Jefferson street and Chamberlain avenue, stopping the car on Chamberlain avenue. The house of Mrs. Sherman, the mother of plaintiff in error, was on a corner of these two streets, the store of Tom Norman was on an opposite corner, and the Norman residence about half a block up Jefferson street.

When the doctor reached this neighborhood, he stopped his car on Chamberlain avenue, and he and Bachman went into his mother's house. Bachman stopped in the front part of the house and began playing with one of the Norman children who was visiting her grandmother. Sherman and his mother went toward the rear of the house and engaged in conversation. He states that his mother told him that Norman had been drinking the night before, had come home very late and was acting strangely that morning. He says that his mother told him she feared that Norman would attempt to harm his wife in some way.

The witness says that he told his mother he would have a talk with Tom Norman and try to get him to go to town with him. He says that his object in wishing to talk with Norman was that he might get him away from

home. After talking with his mother for some time, he sent Bachman up to the Norman house with the request that Norman come down to the store and let them have some coca cola. He had some whisky and wished to use the coca cola as a chaser. Buddie returned with the report that Norman said he did not have any coca cola. Sherman then wished to know why Bachman did not find out whether Norman had any other kind of soft drink that they might use in the place of coca cola. Buddie had not thought of this and Dr. Sherman asked him to return and see if they could bet something else, to which Buddie said, "Why don't you go yourself?"

Referring again to Norman's actions on the morning in question, concerning which he had been telephoned, the plaintiff in error says that his mother told him that Norman had requested his wife to send everybody away from the house—servants and children—that they might eat their last dinner together, and that this was what had alarmed the sister and mother and caused them to telephone for him.

He and Bachman went together up to the Norman house after Bachman had returned from his unsuccessful coca cola mission, and when they arrived there, they found the family sitting in the back room where they all talked in a friendly and general way for some time. Mrs. Norman then announced that dinner was ready and invited them all into the dining room. Bachman and Dr. Sherman both replied that they had been to dinner, and declined the invitation.

Sherman says that Norman declined to eat dinner and volunteered to go down to the store with them, saying that he could fix them up; meaning that he could supply them with something else to use in lieu of the coca cola as a chaser for the whisky.

Witness testifies that he, Norman, and Bachman walked down to the store in a friendly manner; that Norman took a key from his pocket, unlocked the door and let them in, and after they had entered, Norman locked the door and put the key in his pocket, which latter action Sherman thought was strange and he says it caused him some concern.

After entering the store, the witness reached down in a case and procured a bottle of ginger ale. He took out his whisky and offered Norman some, which the latter declined, saying: "That's what's the trouble with me now, I've got too much." Sherman then handed the bottle to Bachman who took a drink and returned it to him and he took a drink and then took the ginger ale for a chaser.

Norman was at this time behind one of the counters in the store where he had walked upon their entrance.

It appears that there is a room in the rear of the front store room, and Dr. Sherman states that he walked back into this room and invited Norman back there to have a game of checkers, which Norman declined. It seems that the two had played a game of checkers on the Friday night previous, which had resulted in a draw, and the doctor invited the deceased back to play off the

draw. Witness testifies that his only object in offering Norman a drink and inviting him back into this room to play a game of checkers was to show his friendly feeling and to get Norman in a friendly mood.

Dr. Sherman says that after returning from this back room into the store room, he invited Norman to ride with him and Bachman back to town. Norman did not reply. The witness then asked Norman for a cigar, got it and paid for it, when he (Norman) reminded him that he had forgotten to pay for the ginger ale. He had given him a nickel for the cigar and the witness then handed Norman a dime and Norman ran his hand into his pants pocket bringing out some change and handing a nickel to the witness. At this time, Norman was behind the counter and the plaintiff in error out in front. They were facing each other on either side of the counter.

Dr. Sherman says that he then turned with the intention of going out the front door, and that Norman walked back toward the rear end of the counter; and that just before Norman reached the end of the counter, he (Sherman) heard Norman say: "I'm going to kill the whole damn family, and you first." Whereupon the witness said that he turned around, pulling out his pistol at the time Norman was coming around the end of the counter out into the center aisle, and began to shoot, firing the pistol as many times as it would shoot. He said that as Norman reached the end of the counter, he made some kind of motion like he was getting something out of his pocket and that he thought he saw an object

in Norman's hand and that Norman was going to kill him.

To use the language of the plaintiff in error in describing this tragedy, he says:

"As he (Norman) came around the end of the counter, I pulled the pistol from my pocket. As soon as he made this move, I jerked the pistol from my pocket—from my hip pocket—and began to fire, and he was coming toward me all the time while I was firing the last shot. When I fired the last shot, he was standing with his left side toward me. As I fired the last shot, he had one hand behind him, like this,—(indicating) and the other in front of him, raised in that position—I should think he took about two or three steps while I was firing."

According to the witness, the only language that the deceased used on this immediate occasion was that just above quoted, to the effect that he was going to kill the whole damn family, just before he started around the counter. The witness says that after the shooting he sent Bachman into the rear room Norman had gone, directing him to get the key to the door away from Norman; that Bachman returned with the key and that they went out the front door and he locked it and went over to his mother's; that he told her Norman had tried to kill him and he had shot him, requesting her to go over to the store and see about him. He says she told him she was not able to do this and he then gave the key to a man named Leutgens, who was nearby, telling him the same thing about shooting Norman that he had told his

mother and asking him to see about Norman and see what he could do for him.

He says that he then got into the car with Backman and went to George Beckert's residence. Not finding him there, he went to Beckert's saloon; that he then went to Esquire Bork's to surrender, and sent Bachman and Beckert out to the residence of Judge Fleming, his lawyer.

The witness denied that he said anything to Bachman about the killing on the way to town and stated that their conversation was general.

During the course of his testimony, Dr. Sherman detailed many threats on the part of Norman against him and the Sherman family, which had been communicated to him previous to the killing, to the effect that Norman would kill him. These will be mentioned later in the opinion, as well other parts of the testimony of the plaintiff in error. He claimed that Norman was a violent character and that he was very much in fear of him; that he thought Norman was attempting to draw a weapon on him; and that he believed he shot him in his necessary self-defense. Such in brief is the testimony of the plaintiff in error, which presents the entire theory of his case.

The witness Bachman, introduced for the State, contradicts the testimony of the plaintiff in error in many of its essential details, particularly as to what occurred in the store.

Bachman testified that he was eighteen years old; that he had lived in Chattanooga for about thirteen or four-

teen years; that he had been in the employ of Dr. Sherman for some time, collecting for him and acting as his chauffeur; that on the morning of the killing he was eating his dinner when Dr. Sherman telephoned to him to get the machine quick and bring it around to the Eagle's Club; that he went back and finished his dinner and then went to the garage after the machine and proceeded to the clubhouse. Not finding the doctor there, he located him at George Beckert's saloon. The doctor then got into the machine and they drove to Mrs. Sherman's house.

The testimony of Bachman and Dr. Sherman is in substantial accord as to what happened at the Sherman house. Bachman said he stopped in the front part of the house to play with the little girl while Sherman went toward the kitchen and had a conversation with his mother. Bachman also agrees that Dr. Sherman sent him up to get Tom Norman to go down to the store and let them have some coca cola; that he returned reporting that Norman had no coca cola; and that he and Dr. Sherman then went together to the Norman house.

The witness says that they went into Norman's house, the latter was sitting down, together with his wife who had the baby in her lap. He says that both Mr. & Mrs. Norman invited them in to dinner, which they declined; and that Sherman again asked Norman about the coca cola, to which Norman replied that he did not have any coca cola, but had some red soda at the store. Bachman says that Mrs. Norman then said: "Well, go down and get some then, Tom." He said that the doctor, Norman,

and himself went to the store and when they got there, Norman unlocked the door and they went inside. Bachman says that Dr. Sherman at this time said: "You'd better lock the door, I've got some whisky here and don't want anybody to see us drinking it." He says that Norman then locked the door as requested.

Bachman gives pretty much the same account that Dr. Sherman does as to the latter inviting Norman to take a drink and Norman's refusal, saying he did not want any. Bachman says that he then tasted the whisky and Dr. Sherman drank pretty much all that was left in the bottle, and asked Norman where he should put the bottle. Norman said he would put it behind the counter where no one could see it. The witness states that Dr. Sherman then walked into the back room and called to Norman inviting him to play checkers, which Norman refused; that this invitation was repeated several times and each time refused. Sherman then came out of the back room and bought a cigar from Norman for which Sherman handed Norman a nickel and the latter said, "You haven't paid me for the ginger ale." The witness then tells about Sherman giving Norman a dime and Norman reaching down in his pocket to get a nickel to give back to him. Witness, however, stated that Norman had the key to the door in his hands at the time and shifted it from one hand to the other in making this change.

During this conversation Norman was behind the counter. Buddie says that the deceased then remarked:

Sherman v. State.

"I have got to be in town by two o'clock," starting around the end of the counter. Sherman then called out: "Bud:" when the witness looked at him and saw him with a black pistol extended in his hand. Norman threw out his arms at this time, according to this witness, exclaiming: Don't do that! Don't do that! You frighten me."—holding the key in his right hand, when Sherman began shooting and Norman "kinder done like he was trying to get to him and turned around this way, ran into the back room and fell up against the stove—sat up against the stove."

Bachman then says he asked Sherman if they were blanks he was shooting, to which Sherman answered: "No, you damn fool you, they are real bullets."

The witness says that Sherman told him to go into the back room and get the key, and as he went into the room Norman said: "O Lordy, Buddie, what does he mean? What did he do it for?" Buddie says that he asked Norman for the key, taking it out of his hand. He unlocked the front door and he and Sherman went outside.

Bachman referred to the statement, that Norman made a motion toward his hip pocket, as "a lie," and likewise characterized the statement that Norman said he was going to kill the whole damn family, just as he started around the counter.

The witness said that when they went out of the store, Sherman said to him: "Don't you say anything about what happened in here until you get in the court room."

Bachman said: "What shall we do?" Sherman re-
plied: "Lock the door or he will come out here after
me." Bachman then locked the door and handed the
key to Sherman who said: "That is some nerve, aint it
kid?"—and went over to speak with his mother. He cor-
roborated Dr. Sherman's story as to what he said to his
mother and his subsequent conversation with Mr. Leut-
gens, requesting the latter to look after Norman.

Bachman says that he then cranked up the machine
and he and Dr. Sherman got in and started to town,
whereupon Dr. Sherman began to tell him what he must
say, or testify to, in regard to the happenings in the
store. He told witness he must say that Tom Norman said
he was going to kill the whole damn bunch, and "me
first," and he also told the witness to say that witness
took the key out of Norman's pocket and to say that
Norman reached in his hip pocket for something. Sher-
man also told Bachman, according to the latter, that he
would take him to Detroit and show him a good time,
saying that he had plenty of money, and adding: "If
you don't tell what I told you, it won't be good for
you."

This briefly is the testimony of Bachman, which, if it
is to be believed, utterly destroys the theory of self-
defense urged in behalf of Dr. Sherman.

Bachman's testimony is very vigorously attacked by
counsel for the plaintiff in error. It appears that after
reaching the city on the afternoon of the tragedy and af-
ter the services of Judge Fleming were secured, that

Bachman made a statement to the judge with reference to the circumstances of the killing which was in substantial accord with the statement of Dr. Sherman heretofore detailed. Furthermore, at the preliminary hearing, he testified to the same effect and there is evidence tending to show that he made a statement of like import to Judge Shepherd, another of defendant's counsel, and perhaps to some one else after this occurrence.

It is further said that Bachman was jointly indicted with Dr. Sherman for this killing, placed in jail, and, that in consideration of his reversing his previous statement, the district attorney released him on straw bond and discontinued the prosecution of the case against him, and it is urged that Bachman's testimony given upon the trial was induced by this action of the State, and is therefore not to be credited.

Bachman made an explanation of his statement to counsel and of his statement on the preliminary hearing, which was to the effect that he was afraid of Dr. Sherman and that these prior statements of his were made at Dr. Sherman's instance. He refers to his former statements as the "lie doc told me to tell" and says that he told this "same lie" on the various occasions referred to. He further states that when he was put in jail he did not especially mind being there, but says that he could not stay there with "that lie in my system, it was choking me." He then said that he told his people when they came to see him that he was going to tell the district attorney-general the truth about it, for he said " that lie

was hurting me." The district attorney-general and
other counsel for the State then called on him and he
made the statement to them which he made upon the
trial.

It must be remembered that this boy was an immature
youth, eighteen years of age, in the employ and manifest-
ly very much under the influence of Dr. Sherman, and,
from the way in which he refers to his employer, he was
attached to him. The jury doubtless believe the story
that Buddie Bachman told on the trial of this case. The
language that he used in explanation and in disavowal
of his former statements to defendant's counsel and on
the preliminary hearing was so artless and boy-like that
it seems impossible to have been put into his mouth by
any interested person. It is so spontaneous and simple
an explanation that we are not surprised the jury accept-
ed it as true, and lent credit to the testimony which he
last gave on the trial. The case of the State does not de-
pend, however, on the testimony of this young boy. Cer-
tain facts are conceded by the plaintiff in error. Among
them are these:

On the Sunday morning in question the plaintiff in er-
ror procured the pistol and a bottle of whisky. Taking
his chauffeur, he drove in his machine out to the corner
of Jefferson street and Chamberlain avenue. He went
into his mother's house and sent Bachman up to Nor-
man's to try to get the latter to come down to the store.

When Norman did not come in response to the boy's
visit, Dr. Sherman himself went to see him and induced

him to come to the store.  When they reached the store, Dr. Sherman invited Norman to take a drink with them, which was declined, then took some whisky himself.  Dr. Sherman then tried to get Norman to come into the rear room of the store, which Norman also declined to do; and later, as Norman walked out from behind the counter in the store, after selling Dr. Sherman a cigar, the latter opened fire upon him with his pistol, killed him, and upon Norman's body was found no weapon, nor is it insisted that he was armed at the time.

So, that the theory of self-defense offered in this case rests upon very narrow ground.  It is based altogether upon Norman's supposed dangerous character, previous threats, and the threat alleged by Dr. Sherman to have been made just prior to the killing, accompanied by a motion of his hand as if to draw a weapon, which the plaintiff in error ascribes to the deceased.

Manifestly, if Norman came around the counter and, making a threatening demonstration, advanced upon Dr. Sherman as the latter claims, then Norman could not have received the wounds from which he died elsewhere than in the front, or at any rate, the side of his body. There is a conflict of testimony as to where these wounds were received; that is, as to where the bullets penetrated the body.

The pistol that Dr. Sherman used was an improved 32.20 Smith & Wesson and all the shots received by Norman passed entirely through his body and none of them

Sherman v. State.

lodged therein.   The controversy arises over whether the wounds were received from the front or from the rear.

Immediately after Norman was shot, two or three physicians were summoned who made an examination of him.   He lived some forty-five minutes after receiving his wounds.   The physicians making this examination testified that they were of opinion that the bullets entered the body from the front and side.   They said, however, that this examination was made rather with a view of ascertaining the character of his wounds; that is to say, whether they were fatal and whether anything could be done for him, than with a view of determining the course of the bullets by which he was stricken.   Upon cross-examination, two of these physicians present at the time conceded that their examination was superficial. The third physician present, although his deposition had been taken, was not heard from, the deposition being excluded upon the objection of the counsel for defendant.

Norman's body was prepared for burial and embalmed by an undertaker in Chattanooga.   It was placed in a coffin and hermetically sealed.   About a week afterwards it was exhumed and a *post-mortem* examination had. There was present at this *post-mortem* the undertaker, three eminent surgeons or physicians of the city of Chattanooga and some of the counsel for the prosecution. The doctors making this *post-mortem* examination testified that the body was in a perfect state of preservation; that they subjected it to a thorough examination and that they were able to trace and conclusively determine.

the course of the bullets by which Norman received his death.

There were ten external wounds in Norman's body, made by five bullets. Two of these wounds were in the back, close to the backbone. There were corresponding wounds in front of the body. Another wound was between the sixth and seventh ribs, on the left side, a little back of the median line and there was a corresponding wound on the right side between the eighth and ninth ribs. There was another bullet hole through the left arm, making a wound to the rear of the left arm and a corresponding wound on the other side of the arm. The other wounds were in the right thigh.

The physicians performing this autopsy testified that they were able to trace the course of the bullets through the body in several different ways. They stated that the peritoneum, which is the thin lining of the abdominal cavity, was punctured by two of these bullets and was pushed outward. They illustrated this by pushing a pencil through a sheet of paper so that on the opposite side of the paper from which the pencil entered the hole was stellated and the edges pushed out, and they said that the peritoneum was found in this same condition, just like a sheet of paper through which a pencil point had been driven. This they said was conclusive evidence that the bullets had come from the rear and passed outward through the peritoneum.

It further appeared that the bullet which entered the left side to the rear struck the liver and that the point of

Sherman v. State.

entrance where it struck the liver on the left side was small and the point where it emerged on the right side was larger and stellated. They were also able to trace the bullets by the location of splintered bone.

Other facts were set out by these experts, introduced for the State, from which they say that they were able to testify beyond any doubt that these bullets entered the body of Norman from the rear.

Expert testimony was introduced by the defendant below, which tended to contradict the evidence of the State's experts, the principal contention for the defendant being that on the examination made before the burial of Norman's body by the attending physicians it was found that the wounds in the front of his body were smaller than those at the back and these experts, for this reason, concluded that his wounds were received from the front. All of them, however, practically, conceded that it is not an invariable rule that the point of entrance of a bullet into a human body is smaller than the point of exit. Some of them also undertake to state that the embalming fluid used upon a dead body is calculated to destroy any evidence that the bullet might leave there as to its course. This is contradicted.

It is not possible, within the limits of a judicial opinion, to fully review and compare all this expert testimony, but after a careful examination of it all, we think that the jury would have been fully warranted in accepting the evidence offered by the experts introduced for the State, rather than that offered by the defendant's

experts. The expert witnesses for the State appear to have reasoned out their conclusions more closely and more satisfactorily than do those presenting the opposite view, and they appear to have had more experience in matters of this sort.

So that, if the jury accepted their testimony and their views as correct, we have no inclination whatever to disturb the verdict on this acount.

Certain it is that the evidence of the State's experts as to the point of entrance of these bullets seems to harmonize entirely with Bachman's testimony that Norman was making no attack on Sherman when shot, but that almost immediately, when the shooting began, Norman turned and sought to escape to the rear room.

There are some other matters, however, of ordinary observation and experience, easily to be understood by the lay mind, which seem to demonstrate that these wounds were received from the rear. For instance:

There were two holes in the back of Norman's shirt, which was identified, these two holes corresponding with the wounds in his back. There were, however, no holes in the front of his shirt corresponding with the wounds in his stomach and abdomen. The conclusion, therefore, must follow that these two shots were received by Norman from the rear; that they passed through his body, but their force was so spent, that, after emerging, they did not pass through his clothing. As a matter of course, had he been shot from the front, there would have been holes corresponding to his wounds, in the front of his shirt.

In addition to this it is conceded that the wounds in the front of Norman's body are lower than those in the rear. Dr. Sherman, it will be remembered, was a taller man than Norman and, standing up with his arm extended, he must have shot Norman in the rear of the body, since the bullets had a downward range. In order to reconcile the fact of the wounds in Norman's back being higher than those in the front of his body—in order to recoucile this fact with the theory of plaintiff in errer that Norman received his wounds from the front, it would be necessary for Dr. Sherman to have been stooping down and shooting upward, or else holding his pistol in an unheard of manner.

These circumstances and the testimony of the experts introduced for the State tend strongly to corroborate the testimony of Buddie Bachman and to establish the State's theory.

Beyond all this, it appears that after Norman was shot he went into this little room back of the store where several people saw him before he died, among others the witness Crox, an officer. Crox stated that when he came into the room, Norman was lying on his side and said: "Who is talking?"—and upon being told that it was Crox, Norman replied: "Go and catch him. He killed me without a cause." It is conclusively shown that Norman was aware of his impending dissolution at this time and the language used by him if not *res gestae,* may be received as a dying declaration in further confirmation of the State's theory of this tragedy.

To Sam Bragg, under the same circumstances and at the same time he said: "They shot me in my tracks."

And to Buddie Bachman, when he went back as heretofore related, Norman said: "O, Lordy, Buddie, what does he mean? What did he do it for?"—thus indicating that he was entirely unconscious of having given to the plaintiff in error any cause for taking his life.

From the foregoing it must be apparent that the jury were well warranted in discrediting the testimony offered by Dr. Sherman as to the immediate circumstances of this tragedy.

The greater part of the testimony introduced for the defendant below consists of the statements of witnesses as to threats alleged to have been made against Dr. Sherman and other members of the Sherman family by the deceased, the principal witness being Mrs. Norman herself, who admits on cross-examination that she is very much in sympathy with her brother and wants to aid him. No feeling of resentment or particular regret for the killing of her husband appears at any place in her testimony. She states that Norman had threatened her life—that he had attempted her life; that he had attempted the life of her mother; that he had attempted the life of her brother, and, upon the whole, makes him out a very desperate character.

A very striking circumstance in this record appears in the testimony of Mrs. Sherman, Mrs. Norman's mother, and that is that some time ago Mrs. Norman went to consult a leading member of the Chattanooga bar with

reference to procuring a divorce from her husband, but it seems that no steps whatever were taken and the inference is that Mrs. Norman was advised by the attorney that no grounds for a divorce existed and that this effort was dropped. As a matter of course, if the deceased had been guilty of any such conduct toward her on previous occasions as she ascribes to him in her testimony on this trial, this effort on her part to obtain a divorce would not have been so dropped. She would have been entitled to a divorce and it is obvious that she had the disposition to procure it. It is evident from the entire record that she was tired of Norman. That he was a man addicted to drink; that he was to some extent troublesome and quarrelsome may be conceded from the proof in this case, but that he was to any degree dangerous or that any of these persons should have had any great fear of him is not very probable. In Mrs. Norman's testimony she relates an indictment of his making an attack upon her brother with a pair of brass knucks, and then says that she went in and disarmed him, taking the knucks away from him and quieting him down. Then too, on the very day of the killing, it seems that he went to the store at her suggestion and under her direction to get the soda pop for Bachman and her brother. So Norman was not altogether intractable.

The plaintiff in error seeks to make it appear that he feared Norman to such an extent that he left his mother's house and took up his abode in town. It seems, however, that when he went to town, he resided at the Eagle's

Club, and we hear of him principally at that club and George Beckert's saloon. It is therefore plausibly urged by the State that a disposition to minister to his own pleasure and enjoyment, rather than fear of the deceased, induced Dr. Sherman to leave his home.

Furthermore, it is apparent from the testimony of Mrs. Sherman that she was an old lady, nervous and feeble, and required much attention. It would seem, therefore, that had the plaintiff in error been so solicitious to protect his mother and sister from Norman as he would make it appear on this trial, he would never have left this old lady alone merely through fear of personal danger.

The threats which Dr. Sherman claims were made against him appear to have covered a period of three years or so before this tragedy, and, according to the testimony introduced by defendant below, none were ever executed, so that they were so frequent as to have lost all their force. No man who for years threatens and never performs can continue to inspire fear. His threats are regarded as idle. As indicated before, much of the threatening language ascribed to the deceased has been discredited in various ways upon this record and we are not convinced that Dr. Sherman really stood in any serious fear of him. Sherman played a game of checkers with him on Friday night before the killing, and it is certain that he induced the deceased to come to the store on the day of the killing and invited him into the back room to play another game of checkers with him and also in-

vited him to go off with him in his automobile. None of these actions suggest a greatly frightened man.

No matter how violent previous threats or acts of hostility against a defendant may be "they will not of themselves justify him in seeking and slaying his adversary upon the assumption that it is necessary to do so in order to save his own life from the threatened danger. To excuse the slayer, he must act upon an honest belief that it is necessary at the time to take the life of his adversary in order to save his own, and it must appear that there was a reasonable cause to excite this apprehension." *Jackson* v. *State*, 6 Bax., 457; *Rippy* v. *State*, 2 Head, 217; *Williams* v. *State*, 3 Heisk., 376.

From the evidence heretofore quoted in this opinion, the jury was well warranted in concluding that there was no reasonable cause to excite the apprehension of Dr. Sherman at the time he did this shooting. There is no suggestion of such a cause save in his own testimony, and that was so contradicted, the jury was justified in rejecting it entirely.

Concluding this review of the facts of the case, we are fully satisfied that the verdict of the jury is sustained by the proof.

Passing from the facts, we find numerous other errors assigned by counsel for the plaintiff in error, those from 2 to 9 inclusive being with reference to the argument of the district attorney. It is said that he used much unwarranted language in his closing address to the jury; that he made objectionable demonstrations with knives

which belonged to Norman but were brought into court by the defendant below; and that he addressed unseemly language to defendant's counsel in the presence of the jury; and that he undertook to introduce a model or dummy before the jury upon which to hang the clothes of deceased, the model having been previously excluded by the trial judge upon the hearing of the testimony. All of these objections may be said to be objections to the argument of the district attorney, either to his language, his gestures, or his conduct during argument, and they may all therefore be treated alike.

It is thoroughly settled, under our practice, that objectionable argument or improper remarks of counsel afford no ground for a new trial where no objection is made or exception taken at the time of the argument. *Smith* v. *State,* 90 Tenn., 574; *King* v. *State,* 91 Tenn., 617; *Morgan* v. *Duffey,* 94 Tenn., 686; *Ferguson* v. *Moore,* 98 Tenn., 341.

The same rule applies with equal force to gestures and the other conduct of counsel indulged in during argument.

An examination of this record discloses that there is no evidence from which this court can conclude that the foregoing rule was complied with, nothing to show that seasonable objection, or any objection at all was made to the argument of the district attorney at any time during the progress of the trial.

From the bill of exceptions, it appears that the defendant below entered his motion for a new trial on the min-

utes of the court, and filed with the clerk in writing, his reasons for urging a new trial.

The third ground was, "for misconduct on the part of the attorney-general in his closing speech to the jury, as shown by extracts from his address which will be filed as a part of or exibit to this paper."

The fourth ground of the motion relates to the gestures of the district attorney with the butcher knife; the fifth ground to his conduct in hurling the clothes which de- ceased wore around in front of the jury; and the sixth ground relates to the conduct of the district attorney with reference to the dummy or model which has hereto- fore been spoken of.

There are other grounds of motion for a new trial which need not be noticed in this connection.

Following the grounds of the motion for a new trial in the bill of exceptions appears several pages headed:

"Exhibit to Motion for a New Trial."

In this exhibit is contained several pages alleged to be quotations from the district attorney's speech, and in the exhibit there is also a relation of his objectionable conduct complained of on the motion for a new trial; such as gesticulating with the knives, etc.

At the conclusion of each of these quotations from the speech and at the conclusion of each reference to the dis- trict attorney's physical demonstrations, in this exhibit, there follows a statement that exception was taken at the time by defendant to the language or conduct of the dis- trict attorney, but the exception was overruled by the

court.  It nowhere else, nor in any other manner, appears in the record that any exception was taken by defendant on the trial to the action and language of the district attorney in his argument to the jury.

The highest dignity that can be given to this exhibit is to treat it as part of the motion for a new trial.  It really is nothing more nor less.

The question whether on not due exception was taken to the language and behavior of the district attorney is one of fact.  A charge or allegation of such matter in a motion for a new trial is not evidence of the matter, any more than is a like charge of separation of the jury or intoxication of the jury evidence of such separation or intoxication.  It is not sufficient to make such charges, but the charges must be authenticated or established in a proper way.  There is no authentication whatever upon the record of the statements that exception was taken at the time to any portion of the argument of the district attorney.  The mere fact that the written grounds of a motion for a new trial are included in the bill of exceptions constitutes no verification of the statements made in such a motion.  Such inclusion in a bill of exceptions only establishes that the statements or allegations were made on the motion, not that they are true.

In the affidavit of the defendant below, filed on the motion for a new trial, occurs the following:

"He files herewith a transcript, a part of the closing speech of the attorney-general delivered to the jury at the trial and submits to the honorable court that it was a

grievous error to allow the attorney-general to indulge in the terrible and unwarranted invective against him. It was error to allow him to make statements which were unwarranted by the evidence and to stir up the feelings of the jury against him by his demonstrations before the jury. Affiant avers that the demonstration complained of was made in the very presence of the court and over the reserved objections of his attorneys, and no further evidence of this occurrence is needed than the knowledge gained by the honorable court from an actual observation, but affiant, that no mistake might be made in this regard submits as correct a description of it as a stenographer can make."

It will be seen that the defendant in this affidavit does not undertake to make oath to any fact except that the transcript, by which it is to be presumed he means the exhibit to his motion, contains an accurate account of a certain demonstration made by the district attorney. Probably he refers to the demonstration with the dummy, or perhaps he may refer to the demonstration with the knives. This affidavit, by the most liberal construction, cannot be said to verify the alleged quotation from the speech of the attorney-general, any more than it can verify the interpolations in the exhibit that all this language was excepted to at the time it was uttered.

If, however, we concede that it was the intention of the defendant below to make oath to the truth of the entire contents of his motion for a new trial, including the exhibit thereto, still, under the well settled practice of this

court, and uncorroborated affidavit of a convicted defendant cannot be looked to to establish any fact on a motion for a new trial. *Brown* v. *State,* 85 Tenn., 439; *Hannum* v. *State,* 90 Tenn., 653.

In two cases, the practice of allowing attorneys to undertake to prove what transpired on the trial by affidavit is discountenanced, and it is said that the proper way to incorporate into a bill of exceptions such matter is to have the judge to insert it over his own signature. *Turner* v. *State,* 4 Lea, 209; *Hannum* v. *State,* 90 Tenn., 652.

Nowhere, so far as we know, has it ever been thought that an uncorroborated affidavit of an unsuccessful defendant could sufficiently establish a fact to justify a new trial thereupon.

As to these matters occurring during the trial in the presence of the court, the trial judge is the proper witness. Such matters must not be brought into a bill of exceptions merely by affidavits of parties or of counsel, but to be considered in this court, they must otherwise appear in the bill of exceptions, properly in narrative form. To such parts of a bill of exceptions, the attention of the trial judge is always directed, as no bare narration can be therein included without his authority, and he vouches for the accuracy of everything so stated. In any event, the trial judge must in some way certify or verify the actual occurrence of all things enacted in his presence upon the hearing, if such things are to be made the subject of complaint here.

Looking to this bill of exceptions, it really contradicts the statements contained in the exhibit to the motion for a new trial, that exception was taken at any time to the argument of the district attorney by the defendant below. We find in the bill of exceptions, at the beginning of the proceedings on the motion for a new trial, a statement from the district attorney,—that he understands the court puts in the bill of exceptions what he said, and afterward referring to this exhibit, which must have been read as a part of the motion for a new trial, the district attorney says:

"It is just parts of my speech."

The court replied:

"I will put in what occurred there."

At the conclusion of the bill of exceptions we find the following paragraph:

"The court ordered that the complete speech of the attorney-general be inserted, as follows:"

Immediately there follows what is manifestly a stenographic report of the entire speech of the district attorney made on the trial below. It is obviously intended to be a complete report of this speech and what occurred during its progress. There are many interruptions noted therein. There appear colloquies between the district attorney and defendant's counsel. There also appear references to the district attorney's demonstration with the knives and his efforts to bring in the dummy. There also appear therein many interruptions by the court and some remarks that the court made to the dis-

Sherman v. State.

trict attorney during the progress of his argument, but nowhere therein does it appear in any part of the speech that any exception was taken to the language or conduct of the district attorney by defendant's counsel.

This stenographic report was inserted by the direction of the court and it is styled the "complete speech" of the district attorney, and we must look to it to ascertain what occurred during the progress of that speech, so that not only do we find no evidence in this record that seasonable exception was taken to the language or conduct of the district attorney, but as a matted of fact, we find evidence to the contrary.

This being so, under well settled practice, we cannot consider the objections that the plaintiff in error makes to the closing speech of the district attorney. Assignments 2—9 are accordingly overruled.

The 10th and last assignment of error is with reference to the conduct of the jury during the trial of this cause. The most serious complaint made is as to the separation of the jury. It is said that part of the jury walked with one officer through the streets of the city while the remainder of them, with another officer, were at the hotel; that some of them went to visit the Citico furnace while others stayed at the hotel, one officer being with each party; and that on one occasion five of the jurors went in charge of an officer to a vaudeville show in Chattanooga while the others remained at the hotel in charge of the other officer.

The question of the separation of juries is one that has been discussed a great deal by the courts and a number of cases have arisen in this State.

Under the common law the rules on this subject were very rigid, but a review of our cases will show that they have been to some extent relaxed.

One of our earliest cases is that of *McLain* v. *State*, 10 Yerg., 239. In that case there had been a repeated separation of several of the jurors from their fellows without the care of an officer, for the space of fifteen or twenty minutes at a time. A new trial was granted and it was held that it was not necessary for the prisoner to prove that they were during their absence subjected to improper influence from others. There was no effort on the part of the State to show that they had *not* been subjected to any improper influences during their absence or that they had *not* had any communication with outsiders; in other words, no attempt on the part of the State to explain these absences. A new trial was granted.

The next case is that of *Stone* v. *State*, 4 Humph., 26. The question there was whether one juror being seen whispering to a third person and another being seen asleep for an unascertained period of time were good causes for a new trial. With reference to the first objection, the court found that the whispering complained of took place in open court and that it was impossible, from the facts stated, that the juror could have been tampered with, as the subject of conversation was satis-

factorily shown to have been relative to the health of the juror's family.   The court did not discuss the matter of the other juror's falling asleep.   It was there observed by Judge Turley:

"A great deal, first and last, has been said about the beauty and purity of trials by jury, and with truth; and our ancestors were so jealous of its preservation that many absurd practices relative thereto were introduced into courts, which like many other abuses retain possession of them for a long time; among the rest, the practice of not allowing jurors meat and drink until their verdict was rendered.   But these restrictive principles have been broken down in most of the States of the union and even in England; and the purity of jury trials made to depend, not upon form, but substance.   That they have still been preserved in this State and New York to the extent shown in the case of *Brant* v. *Fowler,* 7 Cow., 562, is more a matter of amusement than serious reflection."

In the case of *Hines* v. *State,* 8 Humph., 597, the court again discusses this question of separation of the jurors. Referring to the cases just cited and then formulating certain rules by which questions of this character were to be determined, the court held the true principles to be:

"1st:   That the fact of separation having been established by the prisoner, the possibility that the juror has been tampered with and has received other impressions than those derived from the testimony in court exists and *prima facie* the verdict is vicious."

"2nd:   This separation may be explained by the prosecution's showing that the juror had no communication

with other persons; or that such communications were upon subjects foreign to the trial and that, in fact, no impressions other than those drawn from the testimony were made upon his mind."

"3rd: In the absence of such explanation, the mere fact of separation is sufficient ground for a new trial."

In *McElrath* v. *State,* 2 Swan, 378, the prosecutor in the case, during the process of the trial, spent a night in the room with the jury. The court was of opinion that it could not tolerate a verdict obtained from a jury with whom the prosecutor had associated and held communication during the progress of the trial. The prosecutor filed his affidavit undertaking to set up that he had used no influence upon the jurors prejudicial to the defendant, but the court thought that in so flagrant a case the explanation should be very ample and satisfactory and was of opinion that the affidavit before them presented no such full and sufficient explanation.

In the case of *Odle* v. *State,* 6 Bax., 159, the jury was taken to board at a small two-room house, at which place the prosecutor and his two daughters also came to board. The two daughters were both witnesses for the State. It was necessary for some of the jurors to eat in one of the rooms along with the prosecutor and the two daughters. The verdict in this case was set aside, it appearing that the affidavit offered by the prosecutor and his two daughters as to their association with the jurors was unsatisfactory to the court. They gave no explanation whatever of the suspicious fact that they selected this small

house, where the jury was staying, in which to board, when, as a matter of fact, there was not room enough for the jury. In this case, the principles laid down in *Hines* v. *State* heretofore quoted are expressly reaffirmed and approved.

In *Cartwright* v. *State*, 12 Lea, 620, it was said:

"It is the opportunity of tampering with a juror afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial." It was there charged that one of the jurors was sitting on a veranda alone, which was outside the room in which the remainder of the jury were quartered. But it appeared that this veranda was on the second floor and could not be communicated with save through the jury room. Therefore, there was no opportunity for any one to tamper with this juror.

In the noted case of *H. Clay King* v. *State*, 91 Tenn., 617, the jury, during the trial, went beyond the border of the State, taking a ferry boat and crossing the river into Arkansas. They there remained for a few minutes, walking around, and then recrossed to the Tennessee bank. As a matter of course, when this jury was in Arkansas, a foreign State, it was in law at least dispersed, for the officers were without jurisdiction and could exercise upon the members of the jury no control whatever. Being in Arkansas, the jurors could not be restrained and could act as they saw fit, but, as a matter of fact, it was shown that no one communicated with

them or attempted to communicate with them, and it was therefore said:

"The case was taken thereby without the rule which vitiates the verdict only when a separation is unexplained."

It is apparent, therefore, from a review of the cases, that the rule long ago announced by this court has been in full force and effect ever since, and that a separation of the jury may be explained by showing that those separated had no communication with other persons or that such communication was upon subjects foreign to the trial.

Oral evidence was heard by the circuit judge upon the motion for a new trial with reference to this separation of the jury, and, with abundant evidence to sustain him, the circuit judge made a written finding of fact as follows, appearing in the bill of exceptions:

"Another ground set forth is that the jury did not pretend to stay together, some of them taking long strolls through the city, while others stayed at the hotel. Complaint is made to this court that at one time eleven of the jurors walked out to the Citico furnace. There were two officers Mr. Gross and Mr. Kirklin, one of these officers stayed with a crippled juror at the Tscopik hotel where the jury had quarters, the other being in charge of the jurors going to Citico furnace. The proof shows that *they did not come in contact with, or have any communication, directly or indirectly, with any one, on that trip.*"

Parenthetically, it should be stated here that it is conceded that as to the crippled juror, there was an agreement that he might go to and from the court room in a cab and be handled generally separate from the others when necessary.  We understand that no complaint is made on this record as to him or his separation, except as to one occasion when the officer was away a few feet from him in the corridor of the courthouse.  It is conclusively shown, however, that at that time the crippled juror had no communication with any one.

Continuing his findings of fact, the court said:

"Another ground of complaint is as to five members of the jury going to the Airdome.  The jurors went there in charge of one of the officers, Mr. Gross.  Mr. Twinam, one of the jurors, who was foreman of the jury afterwards, had Mr. Gross to see if they could get a private box, so that they would not come in contact with the rest of the crowd; that the jurors gave the officer the money and he carried them down there after the show began; that they went down Market street and up a street—I believe it was 6th street—to Broad street and up Broad street to the Airdome; that *they did not come in contact with, or have communication with any one, directly or indirectly, going there or coming away; that they took a private box, separate and apart from all others in the house, and went into the house after the show commenced;* . . .  There were two performances, one commencing about 7:30 and the other commencing at 9 oclock; that they went in there after the first per-

formance had begun, and the officer was with them; and
that they stayed until after the second performance had
begun. The testimony before this court shows that they
did not come in contact with anybody, going or coming
from this house; that the officers bought the tickets and
gave each one his change. The character of the show, as
testified to by Mr. Twinam and the other jurors, was a
vaudeville show, with songs and some dancing, like they
usually have at such a show, but there was nothing re-
flecting upon the trial of this case or any other murder
case. There was no picture or word spoken, or anything
of that sort, reflecting upon anything or having anything
to do with this character of lawsuit."

It is, of course, an established rule at this time that
the findings of fact made by the circuit judge on a mo-
tion for a new trial, where there is any evidence to sus-
tain them, are binding upon this court. *Percer* v. *State,*
118 Tenn. 765, and cases there cited.

As stated before, the evidence is entirely sufficient to
warrant every finding which we have quoted from the
circuit judge. Bearing in mind the rule that the State
may explain a separation and show that the separated
jurors had no communication with others, or that such
communications were upon subjects foreign to the
trial—would we be justified, upon this finding of facts
by the circuit judge, in holding this verdict vicious and
granting a new trial?

It also appears from the finding of the circuit judge
that the portion of the jury which remained at the hotel

was kept free from outside communication altogether. It thus being established that no effort was made to communicate with these jurors while separated, or if the performance at the vaudeville be termed a communication, that no communication was had with them in any wise reflecting upon the case at issue, and every circumstance and surrounding of the jurors while · separated being fully and satisfactorily explained in so far as their contact with others is concerned, it would be a violation of all precedent for us to grant a new trial in this case on this ground.

We do not mean in any way to approve the course of the officers in alleging these jurors to become separated and taking part of them to a theatre. While, as a matter of fact, no communication was had with them, or influence exerted upon them, in this case; and no opportunity seems to have been offered for such communication to have been effected, nevertheless the officers' conduct was reprehensible. They should have been fined by the circuit judge. They took a chance which they should not have done. While the circuit judge has found, and we can see that there was no evil results in this case and the defendant was not at all prejudiced, still it might have resulted differently and it might have been necessary to set this verdict aside, and such a practice as that indulged in here cannot·be permitted by a trial court, on the part of its officers or jurors. Both officers and jurors should have been punished by the court.

However, the separation of this jury is so fully explained and all their movements so completely accounted for, and we can so plainly see that no harm resulted to the plaintiff in error thereby, we will grant no new trial in this case.

Another criticism of the jury is made with reference to the use of intoxicating liquors by them. It appears that some of the members procured some beer, or near-beer, with which they indulged themselves. The evidence tends to show, and the circuit judge finds as a fact, that these liquors were not used to excess, however; and, under our cases, it is settled that a moderate use of liquor under such circumstances, where no juror became affected thereby, will not vitiate the verdict and is no ground for a new trial. *King* v. *State,* 91 Tenn., 617; *Stephens* v. *State,* 4 Humph., 26; *Roe* v. *State,* 11 Humph., 491.

Other criticisms of the conduct of the jury are trivial and are entirely eliminated from our consideration by the evidence heard on the motion for a new trial and the findings of the circuit judge.

Reviewing the whole case, it is idle to say that the evidence preponderates against the verdict of the jury. On the contrary, as we view the evidence, it would have sustained a verdict of murder in the first degree. The plaintiff in error had a full hearing and he was represented by some of the ablest counsel in the State, to whose ability and zeal in behalf of their client, we must ascribe the leniency of the jury. We are convinced that

none of the matters complained of worked to the preju-
dice of the defendant on the trial below and are without
apprehension that he has received severer punishment
than he deserved.

The judgment of the trial court will be affirmed.