CASE 35.—PROSECUTION AGAINST VAN GIPSON FOR MURDER.—April 20, 1909.

## Gipson v. Commonwealth

Appeal from Carter Circuit Court.

J. B. HANNAH, Circuit Judge.

Defendant convicted of manslaughter and appeals. —Affirmed.

1.  Criminal Law—Appeal—Question of Fact—Credibility of Witnesses.—The credibility of a witness is a question for the jury in the trial court.

2.  Criminal Law—Question for Jury—Evidence.—In a murder case, evidence held sufficient to go to the jury.

3.  Criminal Law—Trial—Argument of Commonwealth's Attorney. —In a murder case, it was not improper argument for the Commonwealth's Attorney to say, "I demand for the Commonwealth and all these people (meaning those in the courtroom assembled to hear the argument) a verdict of guilty against this defendant;" he having a right to ask such a verdict for the Commonwealth if he believed the evidence authorized a conviction, and to refer to the audience, they being citizens, and as such interested in having the law enforced.

4.  Criminal Law—Trial—Conduct of Jury—Writing Out Testimony.—The practice of writing out the testimony of witnesses by the jury after retirement, and using the writing in arriving at a verdict, is not to be commended.

5. Criminal Law—Appeal—Review—Refusal of New Trial—Under Cr. Code Prac. Sec. 281, providing that the decision on motion for a new trial shall not be subject to exception, the matter of misconduct of the jury, first brought to the attention of the court on application for a new trial, can not be considered on appeal.

ARMSTRONG and DUVALL, JOHN S. MARCUM and FRANK PRATER for appellant.

JAMES BREATHITT, Attorney General, and TOM B. M'GREGOR for Commonwealth.

OPINION OF THE COURT BY CHIEF JUSTICE SETTLE —Affirming.

The appellant, Van Gipson, insists that he was illegally convicted in the court below of voluntary manslaughter, under an indictment charging him with the murder of Elmer James, and his punishment fixed at confinement in the penitentiary twenty-one years, and by this appeal seeks a reversal of the judgment entered upon the verdict of the jury.

James was shot in the back and instantly killed, and appellant admitted on the trial that he killed him, but claimed that in taking his life he acted in self-defense. The Commonwealth's theory is that appellant shot and killed deceased from ambush, or when he was fleeing from him. The latter view was favored by its counsel because of the character of the wound inflicted; two physicians having testified that they were unable to probe the wound from the point of the bullet's entrance, from which they deduced the conclusion that, when shot, the body of deceased was inclined forward as if he were running, which stretched the muscles and ligaments of the back, but that, upon receiving the wound and falling, they relaxed and resumed their normal position, thereby closing the wound, and so obstructing the passage made by the bullet that the probing was made impossible. On the other hand, if, when shot, deceased was, as claimed

by appellant, in the act of picking up a rock to throw at him, that fact would also account for the closing of the passage made through his body by the bullet.

The deceased married a sister of appellant, and he and his wife made their home with the mother of appellant on another part of the same farm upon which appellant resided. According to the evidence, deceased and his mother-in-law were not on good terms, and for this or some other reason there had been a bad state of feeling existing for some time between deceased and appellant. The killing of James occurred about 7 o'clock on the morning of July 17, 1908, on a branch near appellant's residence. Two or three witnesses introduced by the Commonwealth testified that they heard the pistol shot when the killing occurred, and that it was immediately followed by a cry of distress; but none of the Commonwealth's witnesses saw the killing. One of them, Elmer Webb, a 16-year-old nephew of appellant and a member of his household, testified that he heard the shot, and shortly before it was fired saw appellant get from a trunk his pistol and start with it in his possession toward the tobacco patch, where the killing occurred, saying when he left the house that he would "put Elmer James out of the hollow damned rough." The witness further testified that soon after the appellant's departure he left the latter's house to take some milk to his grandmother, Mrs. Dana Gipson; that upon reaching the top of a hill he heard a pistol shot down in the hollow about 150 yards from him, and, going further, met appellant with the pistol in his hand returning to the house, but neither of them spoke to the other. The witness said he then went on down in the hollow, and there found deceased lying in the path, face down-

ward, dead; that he proceeded to the house of his grandmother, about 100 yards from the place of the homicide, and delivered the milk, without telling her of the death of her son-in-law, and then returned to appellant's house; that upon his arrival at the top of the hill beyond the hollow he again met appellant, who asked him if he saw James, and if he was dead, to both of which questions the witness gave affirmative answers; that appellant then told witness to go to the house and tell his Aunt Eliza, appellant's wife, to bring him his clothes, that he was going to Ohio, which intention appellant at once carried into effect, but a few days later returned to this State and surrendered himself to the sheriff of Carter county.

Appellant's account of the homicide greatly differed from that of the witness, Webb. He testified that he and his nephew, Webb, were at work in the tobacco patch, and his wife was also present when James was killed; that he had his pistol with him, because he had learned from his mother the day before that James had threatened to kill her, and also to kill appellant, and had invested the proceeds derived from the sale of a calf in a pistol for that purpose; that James came up the hollow, and appellant said to him, "Good morning," to which James replied, "Go to hell, you damned son of a ——," and added that Eliza, appellant's wife, had been telling lies on him. Appellant further testified that, following these statements of James, he told him of his abuse of and threats against appellant's mother, and that he should not blackguard his wife, and must get his clothes and get out of the hollow, or he (appellant) would put him out; that James thereupon cursed appellant, said he would kill him, and, picking up a rock, threw it at him, but appellant dodged it; that James then threw

a second rock, which struck appellant on the hip, following which he jumped from the bank over the branch, and, stooping over, with his back toward appellant, picked up the third rock, and was in the act of raising it, to again throw it at appellant, when the latter shot him with the pistol; that James then dropped the rock, gave a cry and ran back down the hollow about forty yards, fell to the ground, and soon died. The post mortem conducted by the physicians showed that the pistol ball passed through the lower part of the heart, causing, as the physicians testified, instant death. They therefore expressed the opinion that deceased fell where he was shot, and this testimony, it was urged in behalf of the Commonwealth, contradicted that of appellant that deceased ran forty yards after he was shot, and, together with the nature of the wound received and proof of tracks found near the body, tended to support the theory of the Commonwealth that deceased was fleeing from appellant when shot.

Various grounds were filed by appellant in support of his motion for a new trial, but we deem it necessary to consider only such of them as are urged by counsel for a reversal.

Their first contention is that the trial court erred in refusing to permit appellant to testify for himself that his mother, a day or two before the homicide, informed him of James' abuse of and attempt to strike her, and his threats against her and appellant. There is no ground upon which to rest this contention, for the bill of evidence found in the record shows that both appellant and his mother testified in detail as to this matter, without objection or denial from court or counsel. We assume, therefore, that counsel for appellant inadvertently overlooked that part of the evidence.

The second contention of appellant's counsel that
the verdict of the jury is flagrantly against the evi-
dence, we must also pronounce untenable. This con-
tention is based on the alleged contradictory state-
ments of appellant's nephew, Elmer Webb, without
whose testimony, it is argued, appellant could not
have been convicted. It must be conceded that Webb
was not consistent as a witness. It appears that he
first testified at the inquest-held by the coroner, and
then denied that he knew anything about the killing
of James, but upon being charged with the homicide
and placed under arrest therefor the following day,
admitted knowledge of the crime, and for the first
time told that appellant was the slayer of James, and
revealed the facts with respect to the crime as he
seemed to know and understand them. Again, only
the day before appellant's trial, Webb was by the
latter's procurement taken to the office of his counsel,
and there, in the presence of appellant, his grand-
mother, the counsel, and one or two other persons,
signed and perhaps swore to, a written statement in
which he substantially corroborated appellant's ver-
sion of the manner in which the homicide occurred.
Yet, when called to the witness stand during the trial,
he made the same statement with respect to the homi-
cide that he made at the time of his arrest, at the
same time admitting that he made the statement of
the day before, contained in the writing produced by
appellant's counsel, but claiming that it was untrue,
and that he made it because of the presence of the
grandmother, and through fear of his uncle, the ap-
pellant, with whom he had lived, and by whom he had
once been whipped. It is not material whether this
court would or would not have accepted the testimony
given by Webb on the trial. It was for the jury to

determine whether he then told the truth. They had him before them, saw his demeanor, and heard his statements; and we, even if disposed to disbelieve the witness, have no right to invade the province or usurp the powers of the jury by declaring that his testimony should have been rejected. We are, therefore, unable to say that the verdict was flagrantly against the evidence; and, as it would be still wider of the mark to declare there was no evidence authorizing it, we cannot, as requested by appellant, hold that the trial court should have peremptorily instructed the jury to acquit him.

It is also contended by appellant that the circuit court erred in permitting the Commonwealth's attorney, over appellant's objection, to say in argument to the jury, ''I demand for the Commonwealth and all these people (meaning those in the courtroom assembled to hear the argument) a verdict of guilty against this defendant.'' The statement in question was not prejudicial. The Commonwealth's attorney had the right to ask for the commonwealth a verdict of guilty if he believed the evidence authorized appellant's conviction, and to refer to the audience present, as was done; they being citizens of the Commonwealth, and in common with all other people, interested in having the law enforced by the punishment of the guilty.

It is further contended that a new trial should have been granted because the jury were guilty of improper conduct, in that one of their number, after the submission of the case, took it upon himself to reduce to writing the testimony of each witness, which writing, it is claimed, was used by the jury in arriving at a verdict. It appears that the writing referred to was done in the presence of all the members of the

jury, and in the absence of proof to the contrary must be presumed to have been the joint production of all, though written by one of their number.  The writing does not seem to have been preserved, and, not being in the record, its accuracy cannot be tested by a comparison with the contents of the bill of evidence brought to this court.  We do not mean to commend such a practice, but it does not appear to have been prejudicial in this case to the rights of appellant. Moreover, the error, if it be such, is one which this court is without power to review. As said in Stuart v. Commonwealth, 105 S. W. 170, 31 R. 1343: "But waiving this matter (as to manner of arriving at the verdict in that case) and also the question of the impropriety of permitting an attack upon the verdict by the members of the jury—which this court, in Commonwealth v. Skeggs, 3 Bush 19, and Lucas v. Cannon, 13 Bush, 650, seems to have held could not be done—as the alleged error charged to the trial court grew out of its refusal to grant appellant a new trial on account of the action of the jury complained of, and was a ruling as to a matter brought to the attention of the court for the first time on the application for a new trial, we are prevented by section 281, Cr. Code Prac., from considering it."  Redmon v. Commonwealth, 82 Ky. 333, 6 R. 225; Rutherford v. Commonwealth, 78 Ky. 639, 1 R. 410.

No objection is made to the instructions, and our examination of them convinces us that none could be urged, as they fully and fairly advised the jury of the law with respect to every aspect of the case in language that the jury could not fail to understand.

The record manifesting no error that could have been prejudicial to the appellant, the judgment is affirmed.