## Miracle v. Commonwealth.

(Decided May 17, 1912.)

### Appeal from Bell Circuit Court.

1. Murder—Plea of Insanity—When Jury Justified in Finding Against.—Where a person charged with murder had, several years before the commission of the crime, received two injuries upon the head, and thereafter looked queer, and sometimes acted in an unusual manner, and did not seem to be the same man that he was before, the jury was justified in finding against his plea of insanity.

2. Murder—Plea of Insanity—Evidence.—It was not error upon the trial of one charged with murder to admit in evidence testimony

showing he had killed another man a half hour before he committed the murder for which he was being tried, since he relied upon the effect of the first killing upon his mind in support of his plea of insanity, and had first introduced evidence of the former killing.

3. Jurors—Disqualification of—When Question Cannot be Raised in Court of Appeals.—Where the accused failed to object and thereby avail himself of the disqualification of jurors for cause, he cannot raise that question for the first time in the Court of Appeals.

4. Jury—Decision Upon Challenges Not Subject to Exception.—The decisions of the trial court upon challenges to the panel, and for cause, are not subject to exception, and cannot be reviewed by the Court of Appeals.

5. Juror of Kin to Deceased—When Will Not Invalidate Verdict.—The fact that one of the jurors was of kin to the deceased, but did not know that fact until after the verdict had been returned, does not invalidate the finding of the jury.

6. Instructions—Insanity of Accused—Question of What Not Valid Objection to Instruction.—It is not a valid objection to an instruction which advises the jury that they shall find the accused guilty unless they believed him to be insane beyond a reasonable doubt; it is not necessary that they should be told they should find him guilty unless they believed him to be insane from a preponderance of the evidence.

7. Argument of Counsel—What Not Sufficient Objection to.—An objection to the remarks of counsel in making his argument to the jury, made privately to the judge, and not in the hearing of any of the counsel for the Commonwealth, is not a sufficient objection to bring that question before this court for a review.

FRANK BAKER and COLSON & HURST for appellant.

JAMES GARNETT, Attorney General, JAMES D. BLACK, Assistant Attorney General for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

Appellant, Cal Mircale, was indicted, tried and convicted of having wilfully murdered Dulcie Partin, a woman, and his punishment was fixed at death. The murder was committed on Sunday, August 27, 1911, at about three o'clock in the afternoon, on a public road immediately in front of the residence of Mrs. Mary Goodin, on Straight creek, in Bell county. Dulcie Partin, Charles Jones, Will Jones Joe Partin, Margaret Sampson, Jennie Sampson and Mary Goodin were present, and witnessed the killing, Matthew Jones lived about half a mile from Mrs. Goodin's residence, and upon the same road. Several of the persons at Mrs. Goodin's residence had heard

a pistol shot from the neighborhood of Matthew Jones' residence, and had just left Mrs. Goodin's house, and were walking in the direction of Matthew Jones' residence, when they met appellant coming up the road toward them from Matthew Jones' residence, with a pistol in his hand. When Miracle met them in front of the Goodin house, Dulcie Partin turned and started to go back into the Goodin house, when Miracle called upon her to stop. She immediately exclaimed, "Lord have mercy Cal Miracle, I haven't done anything in the world to you, or said anything about you." Whereupon he again commanded to her to stop, adding, "if I can't get your damn brains, I will get your heart's blood." Miracle immediately fired three shots at Dulcie Partin, whereupon she ran to Charlie Jones, and attempted to shield herself behind him. She threw her arms around Jones and appealed to him not to let Miracle shoot her any more. She had both hands up, and was begging Miracle not to shoot when Jones grabbed Miracle's pistol but did not succeed in obtaining possession of it. Miracle said to Jones, "I ain't got anything against you, but don't you take hold of my gun;" and reaching around under Jones' arm, while Dulcie Partin was hanging to Jones, Miracle fired two more shots into her body. She fell to the ground, and died in a few moments. During the difficulty Miracle told Charlie Jones that he had killed his "old God damn long legged black daddy," and to go to him and do whatever he pleased with him, and that Charlie Jones would not be hurt if he didn't come back. As Miracle left the scene of the murder he "broke" his "gun," and throwing out the shells said, "I will get some more ammunition and come back and clean up this God damn branch."

While Dulcie Partin was begging Jones to protect her from Miracle, Mrs. Goodin, an old lady seventy-one years of age seized Miracle by his left shoulder and besought him to cease shooting Dulcie Partin; whereupon Miracle said to Mrs. Goodin, "Don't put your hands on me, I don't want to hurt you."

Immediately after the murder Miracle fled the State, and made his way through Tennessee, Georgia and into Alabama, where he was arrested at the railroad station in Birmingham, in October. At first he denied his identity, and refused to return to Kentucky without a requisition, but finally admitted his identity and consented to return. In speaking of the difficulty shortly after his

arrest, he said, "I got two of them and now they have got me, and I am ready to take my medicine."

It subsequently developed that about thirty minutes before Miracle killed Dulcie Partin he had shot and killed Matthew Jones at his residence further down the road.

Dulcie Partin was the wife of William Gibson, although both of them seem to have been best known by the name of Partin. Sometime before the homicide Miracle had requested Columbus Jones to help him whip the Partins, adding that if Jones would go with him he "would dynamite them."

The record wholly fails to show any previous difficulty between the Partins and Miracle, or any motive for the murder. The only other bit of evidence tending to show any ill feeling between the parties, is contained in the statement of William Partin, the husband, to the effect that Miracle's feelings toward him previous to the tragedy "seemed to be cold."

Appellant relies upon the following grounds for a reversal: (1) insanity of Miracle at the time he committed the murder: (2) error of the court in admitting evidence of the killing of Matthew Jones by Miracle; (3) error of the court in permitting the jury to be separated during the trial; (4) that four of the jurors had served upon the jury within twelve months before this trial; (5) that two of the jury who were summoned from bystanders were improperly summoned by the sheriff; (6) that Tom Smith, a juror, was of kin to Dulcie Partin, the deceased; (7) that instruction No. 4 relating to the insanity of Miracle was erroneous; and, (8) misconduct of counsel for the Commonwealth. We will consider these grounds seriatim.

1. On Christmas day 1909, Miracle had a difficulty with Matthew Jones, in which Jones struck Miracle across the head with a shot gun. Dr. Corum attended Miracle at that time. He found a wound on the back of Miracle's head, near the top; the flesh and skin were badly lacerated and bruised, and the outer covering of the bone was knocked off. Some four or five years before the homicide Miracle had fallen from a train at Wasioto on Greasy creek, and was injured somewhat. Dr. Ramsey, who attended Miracle on that occasion, found him unconscious, and he remained in that state for about a week. It is contended that these two injuries affected Miracle's mind to such an extent that he was not

mentally or morally responsible for his acts. The proof upon the subject of Miracle's insanity, is as follows:

Ben Mason, a neighbor, testified that Miracle was kept at Mason's home during the time he was unconscious from the fall from the train, and was in an apparently demented condition.

George Mason, a neighbor, noticed that Miracle's speech was not like it had been before he was hurt, and that "he looked queer out of his eyes."

Luster Martin, another neighbor, was asked what Miracle's condition was after he was injured from the fall, and answered as follows:

"I saw him a couple of times before I observed any difference in him and that was at Caney Creek Coal Company one afternoon, and he was talking and he was talking with good mind as I ever heard him, and all at once he changed off and said, 'I have got to leave here I am subject to kill Guy Wilder;' and I never saw Wilder and they were good friends as was anywhere."

Martin Head, another neighbor, testified that after Miracle's injury from the fall "he had a whole lot of change in his looks, and did not act like he always did before."

George Fuson, a neighbor, says that after Miracle was injured "sometimes it seemed like he had his right mind, and sometimes I would see him since he got hurt on Greasy Creek and he would seem to be 'worser' in his mind at times."

Roark says Miracle would sometimes, without any excuse, seem to be mad or moody, and he could not account for it.

Tilford Bowling, when asked if he had observed any change in Miracle's mental condition after he was hurt, answered: "Yes, sir; he seemed different to me—seemed to me that he was not right." Again, Bowling said Miracle never held his head exactly like he did before; did not look out of his eyes like he did formerly, and "does not walk like he did pervious to the injury."

In March, 1911, Miracle worked for J. L. Begley, and Begley thought his mind was not right at times, because at times he seemed to do good work, and at other times he did not do the work like he should have done it.

Dr. Corum says the blow inflicted upon Miracle by Jones probably would affect the brain or injure the mind; but Dr. Corum does not claim to be an alienist, and

stated he had had very little experience with mental diseases.

This is all the testimony upon the subject of insanity. It will be noticed that no specialist or person who has had any experience in treating diseases of the mind was called as a witness; on the contrary, with the exception of the two physicians, the witnesses were all neighbors, who did not claim and would not say that Miracle was mentally unsound. The substance of their testimony is to the effect that he looked queer, and sometimes acted in an unusual manner, after he had received his injuries. Admitting therefore, as must be done, that there was sufficient evidence upon the subject of insanity to carry that issue to the jury, it is sufficient to say that there was ample evidence to sustain the finding of the jury against the plea of insanity. Indeed, it is difficult to understand how the jury could have found otherwise.

2.    It is insisted, however, that the court erred in admitting evidence of the killing of Matthew Jones by Miracle immediately before he killed Dulcie Partin. The record shows, that in his opening statement to the jury, Miracle's attorney stated that Miracle had killed Matthew Jones, and that it was that killing which caused Miracle to become excited and unbalanced, and in such condition of mind, that when he met and killed Dulcie Partin he did not know what he was doing. In other words, it was appellant's contention that his killing of Jones constituted his defense for the killing of Dulcie Partin; or rather, that his mind had become so much disturbed by the first homicide that he was "running amuck" and not in possession of a responsible mind when he committed the second. It is apparent from the outset of the trial that Miracle's defense of insanity was largely based upon the attrociousness of his crime of double murder in his unaccountable killing of Matthew Jones and Dulcie Partin in quick succession; and, in sustaining that defense, his attorney necessarily brought out the fact that Miracle had killed Matthew Jones only a few moments before he killed Dulcie Partin. And, although the court admitted this testimony, it properly admonished the jury that they were trying the appellant for the killing of Dulcie Partin and not for the killing of Matthew Jones. We find no error in this ruling of the court.

3.    It is claimed, however, that the court permitted the jury to separate during the trial. There is nothing in the record to sustain this ground; on the contrary,

the record clearly and affirmatively shows that the jury did not separate at any time during the trial.

4. Again, it is insisted that four of the jurors had served upon the jury within twelve months before this trial. Section 2247, of the Kentucky Statutes provides, in part, as follows:

"If a juror drawn from the drum or wheel case has served in any circuit court on the regular panel within twelve months, such service shall be ground for challenge for cause; if a juror is summoned as a bystander, after having within twelve months served on any jury in any circuit court as a bystander, such service shall be ground for challenge for cause; and if the name of a juror does not appear on the last returned assessor's book for the county, it shall be a ground for challenge for cause."

It will be seen, however, from the foregoing statute, that the former service is a ground for challenge for cause; but, if the party fails to take advantage of the disqualification, there is no error. Furthermore, as no objection was made to these jurors at the time, it cannot be taken for the first time, upon appeal.

5. It is further insisted that two of the jurors, who were summoned from bystanders, were improperly summoned by the Sheriff, in that he did not put their names in the wheel, or have them shaken up with other names, as is required by the statute in the case of names taken from the regular panel. This was not error; but if it was, it cannot be reviewed upon appeal, since section 281, of the Criminal Code of Practice, provides: "The decisions of the court upon challenges to the panel, and for cause, or upon motion to set aside an indictment, shall not be subject to exception." It is well settled by a long line of decisions of this court that the decision of the circuit judge upon challenges to the panel, or for cause, or as to the manner in which the jury is selected, or as to the qualification of jurors, are not subject to exception, and the action of the trial court in respect to these matters, however erroneous or prejudicial to the accused, cannot be reviewed upon appeal. Smith v. Commonwealth, 100 Ky., 133; Vinegar v. Commonwealth, 104 Ky., 106; Curtis v. Commonwealth, 110 Ky., 845; Powers v. Commonwealth, 114 Ky., 237.

6. It is strenuously insisted, however, that Thomas Smith, a juror, was of kin to Dulcie Partin, the deceased, and was therefore disqualified to act as a juror in this

case. The kinship is admitted by the Commonwealth; but it further appears that at the time Smith qualified as a juror and agreed to the verdict, he did not know of the relationship existing between himself and Dulcie Partin; and, in fact, did not know such a person as Dulcie Partin ever had existed, until the case was called for trial. After the verdict had been returned, Smith learned for the first time that his grandmother and the grandfather of Dulcie Partin were brother and sister; that the grandfather of Dulcie Partin married and had a daughter, who was the mother of Dulcie Partin; and that Dulcie Partin's mother was never married, but had borne several illegitimate children, Dulcie Partin being one of them. Smith knew the mother of Dulcie Partin when she was a little girl, but never knew her after she reached maturity, and had no idea she had borne any children. Smith and the Partins lived in widely distant sections of the county, and Smith first learned of the relationship after the trial, from W. H. Ingram, the poilce judge of Pineville. In his affidavit, Smith further swears that his relationship to Dulcie Partin had nothing whatever to do with the finding of the verdict, in so far as he was concerned, and had he known of the kinship he would have excused himself, as he had no desire to serve in the trial of the case.

Strange as it may appear, this question has rarely been presented to the courts of last resort for adjudication. The question came before the Texas Court of Appeals in Baker v. The State, 4 Texas Appeal, 223, in 1878; and, in passing upon the question, the court said:

"Whilst it is always desirable that no suspicion should attach to a verdict in any case, and especially in one involving life or liberty, still, to set aside a verdict after conviction, the cause for setting it aside must be one sanctioned by law. This objection is that one of the jurors who sat upon the trial was related to the deceased. The relationship, as set out in appellant's brief, is that the juryman was 'the husband of the daughter-in-law, and stepfather of the grandchildren of an aunt by affinity to the deceased.' To have rendered the juror liable to challenge because of relationship to the deceased, he must have been related within the third degree by consanguinity or affinity. Jury Law 1876, p. 83, Sec. 26.

"The accused stated, in his affidavit accompanying his motion for a new trial, that, at the time the juror was

impaneled, 'he had exhausted all his challenges, and that the said juror did not make known his said relationship, and defendant did not know his said relationship, and did not and would not have waived the same had he known it. But, on the other hand, it is not shown that the juror was interrogated as to said relationship, which it was the defendant's right to do, under the law, at the time he was placed upon the jury; nor is it shown that he used proper diligence to have discovered it, or that he could not have made the discovery by the use of proper diligence. A new trial will not be granted on account of the disqualification of a juror, though unknown, at the time he was taken upon the jury, to the accused and his counsel, unless it be made to appear that the disqualification could not have been discovered by making proper inquiry. Roseborough v. The State, 43 Texas, 570; O'Mealy v. The State, 1 Texas Ct. App., 180.''

It will be noticed that while the question was fairly presented, it was really disposed of as a question of practice, and decided adversely to the claim of the accused, upon the ground that he had not been diligent in presenting that defense.

However, in the later case of Traviss v. The Commonwealth, 106 Pa. St., 597, decided in 1884, the question was fairly presented to, and decided by the Supreme Court of Pennsylvania, in the following language:

''It appears one of the jurors by whom the verdict was rendered was related to the person who is alleged in the indictment to have been murdered, and the fact of such relationship was not known to the prisoner or his counsel until after rendition of the verdict. While it was shown to the satisfaction of the court below that the juror's mother and the mother of the murdered woman were cousins, and the fact was unknown to the prisoner or his counsel at the time of trial, it was shown with equal clearness that the juror had never seen the murdered woman or heard of her except in connection with the alleged murder, and was absolutely ignorant of any relationship until several days after the verdict was rendered. If the fact of relationship had been known and brought to the attention of the court before the juror was sworn, he doubtless would have been excused or successfully challenged for cause; but it was unknown to the court as well as the counsel of both sides, and the juror, after being examined in the usual manner, was accepted and sworn. The time to challenge is before the

juror is sworn; if not exercised then, the right is waived. That waiver may be relieved against when the party affected has been intentionally misled or deceived by the juror or the opposite party; but it is not even pretended there was anything of the kind in this case. Neither the fairness nor the impartiality of the verdict is assailed on any ground connected with the relationship of the juror to the murdered woman. It is not and cannot be pretended that he or any of his fellows were in any manner influenced thereby. As the learned president of the court below remarked, 'His judgment could not have been affected, even insensibly, by a circumstance of which he had not the slightest knowledge.' The newly-discovered relationship was, therefore, no reason for setting aside the verdict.''

The only case holding differently, in so far as we are advised, is State v. Williams, 9 Hout. (Del.) 508; 18 Atlantic, 549, decided in 1890. In that case Lynam, one of the jurors, was a second cousin of Wright, who was killed, but neither the prisoner nor Lynam had any knowledge of that fact until after the verdict was rendered. In holding that the disqualified juror vitiated the verdict, and was a ground for setting it aside, Chief Justice Comegys, sitting in the Court of Oyer & Terminer, held that the person slain was to be treated as a party to the proceeding. He cited no authority, however, in support of his opinion and made no reference whatever to the Texas and Pennsylvania cases above cited.

The question came before this court in the late case of Brooks v. The Commonwealth, 144 Ky., 110. All that appears in that opinion upon this subject is contained in the following excerpt:

''It also appears in the motion and grounds for a new trial that two members of the jury were related to deceased, and to two relatives of his who were giving active assistance to the prosecution. The two jurymen in question may not in fact have been influenced by this relationship, but the court could not afford to indulge the presumption that they were not. Therefore, this ground authorized the granting of a new trial to appellant.''

It does not appear from that opinion that the jurors did not know of their relationship to the deceased at the time they gave their verdict, and we assume they did have that knowledge. In this respect, therefore, the case differs radically from Traviss v. The Common-

wealth and Baker v. The State, supra. The ground for holding a juror competent under the circumstances is to be found in the fact, that since the juror did not know of the relationship at the time he gave his verdict, that relationship could not have influenced him adversely to the rights of the accused. Where, however, the relationship is known, clearly it would disqualify a juror for cause. Where a juror does not know of his kinship to the deceased, he stands in the same relation to the accused as an entire stranger, in so far as the affinity of blood might affect his verdict. It is the knowledge of the kinship and the feeling that arises from it that works the disqualification; and, if the knowledge is absent, the disqualification disappears. We conclude, therefore, that Smith's kinship to Dulcie Partin, being unknown to Smith at the time the verdict was rendered, does not constitute a valid ground for a reversal.

7. Again, it is insisted that instruction No. 4, relating to the insanity of Miracle, was erroneous. That instruction reads as follows:

(A) "Although the jury may believe from the evidence, beyond a reasonable doubt, that the defendant shot and killed the deceased, Dulcie Partin, yet, if they further believe from the evidence that at the time of the killing the defendant was of unsound mind, then they should acquit him.

(B) "The law presumes every man sane until the contrary is shown by the evidence; and, before the defendant can be excused on the ground of insanity, the jury must believe from the evidence that the defendant was at the time of the killing without sufficient reason to know right from wrong, or that, as a result of mental unsoundness he had not then sufficient will power to govern his actions, by reason of some insane impulse which he could not resist or control."

It is insisted that this instruction should have been so worded as to direct the jury to find Miracle guilty, unless they believed from a preponderance of the evidence that Miracle was of unsound mind when he killed Dulcie Partin, and that the instruction, as given, is erroneous, because it only authorizes the jury to acquit in case they believe, beyond a reasonable doubt, that Miracle was of unsound mind when he killed Dulcie Partin. This instruction, however, is a copy of the instruction approved by this court in Abbott v. Commonwealth,

107 Ky., 624; and what was said there in sustaining the instruction need not be repeated here.

8. Finally, we are urged to reverse and order a new trial, on account of the misconduct of the County Attorney and the Commonwealth's Attorney, in the argument of the case.

As no objection was taken to the remarks of the County Attorney, his alleged misconduct is not here for review. Travelers Ins. Co. v. McInerney, 119 S. W., 172; I. C. R. R. Co. v. Radford, 23 Ky. L. R., 886; 64 S. W., 511; L. & E. R. R. Co. v. Vincent, 29 Ky. L. R., 1053; 96 S. W., 898.

The remarks of the attorney for the Commonwealth were not beyond the latitude allowed to counsel in argument. Gipson v. Commonwealth, 133 Ky., 398. But if they were improper, there is no erroneous ruling of the trial court presented for review, for the reason that the objection thereto was made privately to the court, and not in the hearing of any of the counsel for Commonwealth.

In Farris v. Commonwealth, 14 Bush, 367, we passed upon this question, and said:

"It appears that counsel for appellant objected, privately to the judge, to the statement of the law by counsel for the Commonwealth, and that the judge said he thought the argument legitimate, but that if counsel desired, he would tell the jury that they must be governed entirely by the law as given them in the written instructions. To this suggestion from the court appellant's counsel made no response, and nothing was said to the jury about the matter by the court. We are not prepared to say that the argument of counsel for the Commonwealth, under the circumstances, was improper, but if it was, we are of the opinion that no sufficient objection was made and preserved."

We have thus carefully considered every ground for a reversal relied upon in the brief of counsel for appellant, and fail to find that his rights have been prejudiced in any substantial respect. Appellant having had a fair trial, without any substantial errors against him, the judgment of the lower court will have to be, and it is affirmed. Reed v. Commonwealth, 138 Ky., 577.