WILLIAM G. WATKINS and LURTON McNEIL

*v.*

STATE OF TENNESSEE.

393 S.W.2d 141.

(*Nashville,* December Term, 1964.)

Opinion filed June 2, 1965.

Petition for Rehearing Denied August 16, 1965.

546

JOHN J. HOOKER, SR., Nashville, WILLIAM J. PEELER, Waverly, for plaintiffs in error.

GEORGE F. McCANLESS, Attorney General, THOMAS E. Fox, Assistant Attorney General, for the State.

MR. CHIEF JUSTICE BURNETT delivered the opinion of the Court.

The plaintiffs in error were convicted of accepting a bribe for releasing, or failing to prosecute, one Homer Lee Scott, who was found by them to be transporting intoxicating beverages through a dry county. Watkins was the Chief of the Alcohol Tax Unit, Department of Revenue, while McNeil was the Sheriff of Humphreys County. Watkins was sentenced to serve not less than two nor more than five years in the State penitentiary, while McNeil was sentenced to serve not less than two nor more than three years in the State penitentiary.

An appeal has been seasonably perfected, briefs filed and arguments heard. After a thorough consideration of the matter as presented, we are now in a position to decide the same.

There are two assignments of error: one to the effect that the evidence preponderates against the verdict and in favor of the innocence of the accused; and another to the effect that one of the jurors took notes during the trial of the testimony of witnesses and used these notes in explaining the witnesses' testimony to other members of the jury during their deliberations. The latter assignment was very ably and vigorously argued by counsel for the plaintiffs in error and was the only question

argued, as well it might have been, because after carefully considering this entire record we are convinced that at the trial of these parties the State went all out not to commit error and to give the parties a fair and impartial trial.

From the evidence herein the jury was well justified in finding the following state of facts. Two agents of the Alcohol Tax Unit, Department of Revenue, State of Tennessee, a short time prior to the incident in question obtained information that Scott was delivering whiskey purchased in Nashville to a Mr. Preston in Camden, Tennessee. These agents obtained the license number of the truck operated by Scott and reported this information to the plaintiff in error Watkins and asked whether or not they should try to apprehend Scott. Watkins advised them that he would have the Sheriff in Waverly catch Scott.

Scott was driving through Waverly en route to Camden on the evening of May 31, 1963, at about 9 o'clock when he was stopped by plaintiff in error McNeil. A search was made of Scott's truck and 24 cases of whiskey were found in a hidden compartment under the bed of the truck. Scott proposed to the Sheriff that he would like to ''fix it up and not have no trouble about it.'' After some negotiation, done mostly while the Sheriff and Scott were riding in Scott's truck, it was decided at the insistence of the Sheriff that Scott would return to Nashville and send somebody back to Waverly during the remainder of that night to pay the Sheriff some money for the release of the truck, title certificate and driver's license, and the Sheriff was to keep the whiskey.

Scott returned to Nashville and contacted the operator of a liquor store there, one by the name of Collins, and

Collins then arranged for a man by the name of Lewis in Dickson, Tennessee, to go to Waverly that night and contact the Sheriff in Scott's behalf. Lewis made such a journey but was unable to effect any arrangement with the Sheriff.

The Sheriff, testifying herein, admitted most of the details in connection with what has just been said, except he could only vaguely remember stopping the truck of the description in question. He denied finding any whiskey in the truck but did admit that Lewis had come to Waverly during the night and called him about the matter. He further admitted trying throughout the night, even at 5 a. m. the next morning, to contact Watkins in Nashville.

The testimony relative to the taking of this truck and the whiskey by the Sheriff is thoroughly corroborated, and we have no doubt regarding the truth of the State's testimony on this subject. This testimony was corroborated by twelve witnesses in addition to indirect corroboration from other State's witnesses and admissions made by the Sheriff in his testimony. No proceeding was initiated in the Sessions Court of Humphreys County about the time of the incident against Scott.

On the following day McNeil met Watkins at about the junction of Highway #96 and Interstate 40 in Dickson County, and after some discussion they went to Nashville. Plaintiff in error Watkins called Collins and two employees of Collins' liquor store. An arrangement was made for Watkins to purchase a bottle of whiskey and Collins would slip into the bag with the whiskey the sum of $600.00 in return for the driver's license and title certificate of Scott, and then Scott would have the privilege of regaining possession of his truck. Watkins

admits making the call and purchasing the whiskey but he denies receiving the money.

Shortly thereafter on the same day, Collins says when Watkins learned that Collins would appear before the Commissioner of Revenue and report the incident, Watkins called Collins and again prevailed upon him not to make such a revelation to the Commissioner. When it appeared that Watkins would not influence Collins in this respect Watkins called another State's witness, one J. P. Dolan, and asked Dolan to intercede for him. Watkins admits both of these telephone calls but insisted that neither constituted any admission of guilt of the offense for which he was charged.

It is clear to us that the corroborating circumstances outside the testimony of these witnesses is exceedingly strong in support of the verdict. Watkins first directed the Alcohol Tax Agents who reported the matter to him in the outset and whose duty it was to apprehend persons in violation of the liquor laws not to apprehend Scott but to leave that to the Sheriff; in the second place McNeil never made any charges against Scott after stopping him and finding the whiskey in his truck; and in the third place McNeil's efforts to telephone Watkins during the night immediately after this incident coupled with their activities on the following day clearly corroborate the finding of the jury.

Aside from these strong corroborating circumstances there is very strong, positive and unimpeached evidence by a number of State's witnesses definitely proving the offense charged. Under such circumstances the credibility of the witnesses and the conflicts in the testimony have all been settled by the verdict of the jury, and this being true it makes it unnecessary for us to go into

a detailed discussion of the evidence pro and con. Our only duty has been to determine whether or not the evidence does preponderate against such finding. See *Cooper v. State,* 123 Tenn. 37, 138 S.W. 826, and many, many cases which can be found by Shepardizing the Cooper case.

In an amended motion for a new trial it was stated that the foreman of the jury, one Wingate, made notes during the trial of the testimony of some of the witnesses and used these notes to influence other jurors to his conclusion about the evidence. The statements of two jurors relative to the Wingate notes were attached to this amended motion for a new trial. These statements are not authenticated by the trial judge as being the statements considered by him on a motion for a new trial, so from a technical standpoint it cannot be determined from the record whether or not the trial judge considered such statements in overruling the motion for a new trial. The trial judge made no reference to the statements in his order overruling the motion. Thus it is that the State takes the position that we have no right to consider these things, and should not enter this phase of the argument on behalf of these plaintiffs in error. The State cites a number of cases in support of this contention, all of which are clearly correct we think. The State cites one case and quotes from it of *Koehn et al v. Hooper,* 193 Tenn. 417, 246 S.W.2d 68, which in part says:

"The second question is presented by the insistence that the Court of Appeals erred in refusing to consider the propriety of the action of the Trial Judge in refusing certain special requests. The special requests are not incorporated in the bill of exceptions, nor does it appear in the bill of exceptions that the special re-

quests were refused by the Trial Judge. The special requests are incorporated in the motion for a new trial, but that is a mere pleading and does not take the place of a bill of exceptions. *Sherman v. State,* 125 Tenn. 19, 140 S.W. 209; *Wynn v. State,* 181 Tenn. 325, 331, 181 S.W.2d 332.''

This undoubtedly is the rule that is applied under a factual situation as here, but in view of the fact that this question is so vigorously argued by plaintiffs in error and in view of the further fact that we, in our determination of cases try to bend backwards to see that there is no reversible error in any record, have, and are, considering the question pro and con for the future guidance in such situations, and to find out whether or not, even if these statements were properly authenticated if there would be reversible error in this record.

■ It has been the practice in this State, from the inception of judicial decisions in the trial of cases before a jury, that the jury is not permitted to take exhibits, diagrams and things of that kind to the jury room with them unless consented to by both parties. We have no statute governing the question, and it has grown out from early statements such as, ''It was error, also, for the jury to examine and consider diagrams not introduced in evidence.'' *Railroad v. Lee,* 95 Tenn. 388, 32 S.W. 249. We propose hereinafter to discuss at some length the reason for such practice, and to show whether or not in view of the harmless error statute, T.C.A. sec. 27-117, such an error violates the constitutional rights of a party charged under Article I, Section 9, of the Constitution of our State.

■ A fundamental principle of Anglo-American law is that a person accused of a crime is entitled to a fair

and impartial trial by his peers. (Tenn.Const., Art. I, Sec. 9).

A number of rules surrounding this principle have grown up from the time of the early common law juries to the jury of our present day society. The second assignment of error in this appeal is concerned with one of these rules, designed at the time of its inception to perpetrate the "trial by a fair and impartial jury" of a person accused of a crime. At common law jurors were not entitled to take with them any unsealed papers introduced in evidence except with the consent of the parties, but this is now a matter resting in the discretion of the court, in the absence of a statute. The reason for this common law rule seems to be that the jurors were unlettered men for the most part. A writing to them conveyed nothing. *Higgins v. Los Angeles Gas & Electric Co.*, 159 Cal. 651, 115 P. 313, 34 L.R.A.,N.S., 717.

As an outgrowth of this general rule that jurors were not allowed to take any writing not under seal to the jury room, came the rule that jurors were not allowed to take notes during the trial. Technically these notes would be writings, not under seal. It is easily understood why early common law judges would not allow note-taking by jurors. For the most part in that day, a man of letters was the exception rather than the rule. The suspicion that the lettered man would be overly persuasive with his illiterate juror colleagues in the jury deliberations subsequent to the trial was probably well founded at that early time. To guard against such an evil and to insure a "fair and impartial trial" by jury, the early common law judge simply forbade such a practice. Our time does not require such caution.

Plaintiffs in error contend that the trial judge should have granted them a new trial on the ground that there was misconduct on the part of the jury. The alleged misconduct took place when some of the jurors took notes during the trial, especially when one Wingate, the foreman of the jury, took notes during the trial and used them in the subsequent deliberations of the jury. No objection was made to the taking of notes by the jurors during the trial, nor was there a special request for instructions to the jury concerning the use of such notes.

It is the general rule in the United States that a trial judge may either permit or deny the taking of notes by jurors during a trial. The following excerpts from authorities and from cases dealing with this subject overwhelmingly support this proposition.

In 89 C.J.S. Trial sec. 456, page 80, it is said:

"If they do not thereby consume too much time, it is not improper for the jury to take notes of what is said, or occurs, during the trial.

"* * * Counsel has no absolute right to have the jury take notes at his dictation, and the trial court *in its discretion* may refuse to allow this to be done. * * *" (Emphasis supplied).

This quotation from C.J.S. seems to imply that, absent an instruction from the trial judge to the contrary, the jurors may make notes.

In 53 Am.Jur., Trial, sec. 851, page 623, the author points out:

"Although the taking of notes may not be a commendable practice, yet it is not illegal, and a verdict will not be set aside because thereof where no prejudice to the parties resulted.

Treatise writers are in accord with the encyclopaedic authority on the matter. Underhill on Criminal Evidence, Vol. II, sec. 513, page 1291, makes the following statement:

"Jurors may, however, make notes of the evidence, or the judge's charge, and may consult these in the jury room."

Another leading treatise states with clarity the general rule prevailing in the United States. Wharton's Criminal Law and Procedure, Vol. V, sec. 2112, at page 295, states:

"It is within the discretion of the trial judge whether the jury may take notes at the trial."

The two cases cited by plaintiffs in error stand for the proposition that a trial judge may refuse to allow jurors to take notes and commits no error in so doing. *United States v. Davis* (1900) C.C., 103 F. 457, affirmed in (1901, C.C.A. 6th), 107 F. 753; *Cheek v. State* (1871), 35 Ind. 492.

The facts of the case of *Crisman v. McMurray*, (1901) 107 Tenn. 469, 64 S.W. 711, are readily distinguished from those in the case at bar, in that there was *no* note-taking. The jury, in that case, had gotten an exact copy of the testimony of one of the parties without the consent of the court or the parties.

A further statement of the general rule is found in the annotation covering this subject in 154 A.L.R. 878.

"While the propriety of allowing jurors to take notes during the course of a trial depends in some cases upon the surrounding circumstances, and while some courts have merely expressed doubt as to whether it is improper for jurors to so conduct themselves, it has

generally been held or stated in other cases to be entirely proper for members of a jury to take notes of the testimony or statements or arguments of counsel, either upon their own volition, or upon motion of counsel, particularly in the absence of any prejudice to the parties.

"Other courts have expressed the view that while the practice is not to be commended, *it is a matter within the discretion of the trial court.*" (Emphasis supplied).

It is interesting to note that the case cited in the annotation in support of the emphasized language is *United States v. Davis,* supra, which counsel for plaintiffs in error cites as authority for the proposition that note-taking is improper per se in the absence of a statute. It is true that ten states have statutes specifically allowing the jury to take notes or worded in such a way that the jurors may take materials with them to the jury room; however, there are numerous other states which allow such practice without a statute. (See 154 A.L.R. 878).

This applies to criminal as well as civil cases. In *Gipson v. Commonwealth,* (1909) 133 Ky. 398, 118 S.W. 334, *a murder trial,* it was stated that *if* such conduct (juror reducing to writing the testimony of each witness) did amount to error, since it was brought to the attention of the court for the first time on the application for a new trial, it was error which the court was without power to review.

It is argued by plaintiffs in error that note-taking by jurors is improper because:

"It gives the juror taking notes an undue influence in discussing the case when he appeals to his notes to settle conflicts of memory. Without corrupt purpose,

his notes may be inaccurate, or meager or careless, and loosely deficient, partial, and altogether incomplete." (*United States v. Davis,* supra).

It is further argued by plaintiffs in error that:

"The juror is to register the evidence, as it is given, on the tablets of his memoray, and not otherwise. Then the faculty of the memory is made, so far as the jury is concerned, the sole depository of all the evidence that may be given, *unless a different course is consented to by the parties, or the court * *-* The jury should not be allowed to take the evidence with them to their room, except in their memory. It can make no difference whether the notes are written by a juror or someone else. Jurors would be too apt to rely on what might be imperfectly written, and thus make the case turn on a part only of the facts." (Emphasis supplied). *Cheek v. State,* (1871) 35 Ind. 492.

Persuasive rebuttal to the arguments as to the impropriety of jurors' note-taking is expressed in the language from the following cases. *United States v. Carlisi,* (1940) 32 F.Supp. 479, at 483, argues that:

"There is no legal reason why such notes should not be made by jurors. Judges and lawyers make notes, why not jurors? Certainly the making of notes would better aid their memories and thus enable them to more intelligently consider the evidence.

"While it did not happen in this case I see no objection to all jurors, if they desire, making notes which could be used by them to refresh their recollections, when we realize that the purpose of a lawsuit is to do justice rather than make it a game of chance. The Courts should make progress with the times."

Answer to the argument that the notes might have been "inaccurate, meager or careless" is well expressed in the case of *Davis Die Co. v. Beltzhoover Electric Co.*, (1931) 40 Ohio App. 308, 178 N.E. 418, where the court said:

"It is urged that the notes might be taken incorrectly and thus improperly influence the jurors in their deliberations. Certainly there would be as great danger of error upon the 'tablets of their memory' as upon the tablets in their hands."

In view of the overwhelming weight of authority on this matter, it is submitted that the matter of whether jurors should or should not be allowed to takes notes is a matter within the discretion of the trial judge. Note-taking by jurors might be commendable in some instances and undesirable in others.

For example a juror might take down a date, time, or note any particular fact and not be inattentive to the evidence being presented. This would not destroy his function as juror but would seem to be not only in perfect harmony with such a function but indeed a commendable act. This commendable act may become unreasonable with overindulgence, however. Certainly a juror, unskilled as a stenographer, who tried to write down all the testimony verbatim may not give his fullest attention to the panorama of the evidence presented during the trial. Many a student has missed key points in a professor's lecture because he tried to write down every word the professor uttered in class. Just as the professor will warn his class about such practice, the trial judge, seeing a juror laboriously attempting to transcribe the testimony of a witness, should instruct the juror of such pitfalls. Should the trial judge fail to see the note-taking, counsel

for either side, acting in his capacity as an officer of the court, should bring such to the trial judge's attention.

In the absence of any instructions not to take notes, to say that jurors are guilty of misconduct by taking notes during trial is without foundation. As the court said in *B. H. Palmer & Son v. Cowie,* (1905), 7 Ohio Cir.Ct.R., N.S., 46, 27 Ohio C.C, 617:

"It is true that a juror might, by taking notes, have more information about the case in the jury room than a juror who did not take notes. It is equally true that there is a great difference in the intelligence of jurors. It is true that there is a difference in the memory, power of memory, of jurors and judges, and it is possible that it gives one juror an undue influence with his fellow jurors; but certainly until a caution is given, it would seem to me a very remarkable thing that a juror should be said guilty of misconduct because he took down some notes of the evidence that was being introduced."

Jurors should be made aware that notes taken by them are not a transcript of the case.

It is argued that since Wingate referred to his notes in the jury room that the trial judge should have granted a new trial. The fact that a juror has referred to his notes during deliberation does not seem objectionable, but the note-taker should not use his notes as authority on their face to persuade his fellow jurors. A proper instruction on this matter is found in *Toles v. United States,* 9 Cir. (1962) 308 F.2d 590, where Judge Tolin's (of the U. S. District Court for the Southern District of California) instruction to the jury is quoted:

"I have noted that some of the jurors appear to be making notes. It is perfectly proper for a juror to make notes, but bear in mind they are your notes. They are not a transcript of the case. You can't for instance, pull them on the other jurors and say, 'See, I got a note of this.'

"Some of the judges do not allow note-taking at all and others feel that the notes are taken simply as an aid to memory and that the jury understands they are to recall the testimony and use the notes only as an aid to memory, and any juror who takes notes will use those notes only for that juror's assistance in that regard and not as an authoritative thing to show to other jurors. I belong to the latter number of judges, so go ahead and take all the notes you want."

█ The decision of the trial judge must stand in refusing to grant a new trial even though Wingate may have used his notes as authority in the jury room for two reasons; either one of which would be reason enough to uphold the trial judge.

(1) If the complaining party has not either objected to the practice of note-taking by the jury or at least requested that special instructions be given the jury concerning the use of such notes then such complaining party has no right to assign note-taking or matter generic to note-taking as error. In the absence of a showing of complete ignorance of the fact (note-taking) on the part of the complaining party and/or his counsel it will be presumed that the complaining party and/or his counsel consented to such practice.

There has been no showing of the lack of knowledge in this case. In this matter the case of *Long v. State*,

(1884) 95 Ind. 481, has much to offer. Before going into the holding of this case, it is noteworthy that this case is from the same state (Indiana) as *Cheek v. State,* supra, one of the cases relied upon as authority by the plaintiffs in error. Noteworthy also is the fact that the decision in *Long v. State* was handed down some thirteen years after *Cheek v. State.* This latter Indiana case (*Long v. State*) held that the fact that one of the jurors in a criminal prosecution took notes of the evidence and used them in the jury room did not constitute reversible error where no objection had been entered to such conduct, notwithstanding that such conduct was without the personal knowledge or consent of the defendants, where there was a lack of any showing of a want of personal knowledge on the part of the defendants' attorney of the conduct of the juror. The court said:

> "If we are correct in our holding, that the knowledge of the attorney is the knowledge of the party, it results that the want of such knowledge must be affirmatively shown, as well as want of personal knowledge by the party. To adopt a contrary rule would surround jury trials with uncertainty and hazard by enabling parties to experiment with juries and courts. In support of the verdict, therefore, we must presume, in the absence of a showing to the contrary, that appellants' attorneys had knowledge of the fact that the juror made notes of the evidence, and took them to the jury room, and made no objections. *Where there is knowledge and no objections, consent will be presumed.*" (Emphasis supplied).

In 154 A.L.R. 878, at 885, under "Waiver" the reason for putting the burden of showing lack of knowledge on the complaining party is given:

"Such a waiver becomes operative where the party raising such error, or his attorney, fails to show that he did not have knowledge that the members of the jury were engaged in taking notes, since it is difficult to conceive how jurors could take notes at a public trial without such conduct coming to the attention of diligent parties or counsel, for if a juror is seen continuously writing while testimony is going in, the most reasonable inference would be that he is taking notes thereof." (Citing *Com. v. Tucker*, [1905] 189 Mass. 457, 76 N.E. 127 [7 L.R.A.,N.S., 1056]; *Swift & Co. v. Bleise*, [1902] 63 Neb. 739, 89 N.W. 310 [57 L.R.A. 147]).

The trial judge was not in error for not giving instructions to the jury concerning the use of notes in the jury room without any special request to do so. The following language concerning such an assignment of error is found in *Llewellyn v. City of Knoxville*, (1950) 33 Tenn.App. 632, 232 S.W.2d 568, where objection had not been made to a failure by a trial judge to charge the jury on a particular issue during the trial.

"But we think that his (attorney's) express assent, or even silence waived any error that may have been committed in this respect. * * *

"For otherwise his conduct would operate as a fraud upon the Court."

It is within the discretion of the trial judge to determine whether the jurors may or may not take notes during the trial.

(2) There has been no showing that any prejudice resulted from Wingate's use of his notes in the jury room. Even assuming he used them as authority for persuasion it has not been shown that this materially affected the

outcome of the decision by the jury. Therefore, irrespective of any question of waiver (which is certainly present in this case), this matter is within the purview of T.C.A. sec. 27-117, the harmless error statute. See the language in *Shappley v. Graves,* (1929) 9 Tenn.App. 567, at 579, citing Chapter 32, Acts of 1911 (T.C.A. sec. 27-117).

It has been held, even in those jurisdictions in which the taking of notes by jurors is not a commendable practice, that such note-taking is not illegal and does not require the setting aside of the verdict as a matter of law, but is a question that is left to the discretion of the court. (*Commonwealth v. Tucker,* supra). Since no prejudice was shown to have resulted (even if the practice of note-taking in this case was not commendable) to the party complaining, the trial judge properly overruled the motion for a new trial.

After a very thorough and full consideration of the entire matter, we are well satisfied that these parties have had a very fair trial and that there is no error herein. The result is that the judgments below must be affirmed.

## On Petition to Rehear

Counsel have filed herein a very courteous, dignified and forceful petition to rehear. This petition is bottomed on the proposition that, if jurors are allowed to read their notes taken in the course of the trial in their deliberations, this is a violation of Article I, Section 9, of the Constitution of Tennessee.

The argument in support of this petition is based around the fact that, if a juror is allowed to read his notes taken in the course of the trial while that body is deliberating, this violates the language of Article I, Sec-

tion 9, of our Constitution in that "the accused hath the right to be heard by himself and his counsel; * * * (and) to meet the witnesses face to face, * * *." It is argued, and authorities cited in support thereof, that the right to be heard by himself includes the right to be present at every stage of the trial, and in all felony cases affecting his life or liberty, the defendant must be present during the entire trial, and when the verdict is given. *Andrews v. State,* 34 Tenn. 550; *Witt v. State,* 45 Tenn. 11. After the case has been given to the jury, the accused cannot waive his presence. *Hopkins v. State,* 78 Tenn. 204.

As we see it though, the simple answer to this proposition is that, if this argument is carried to its logical conclusion, then there could never be any conviction in a criminal case without violating Article I, Section 9, of our Constitution, because in every jury trial it goes without saying that the jurors in their deliberations debate the different factual situations that have been presented to them and argue the matter pro and con. One juror may have a more retentive mind than others, and naturally in his deliberations with the other jurors he better states his conclusion and the evidence as he saw and heard it even if done from memory. We can't see why the taking of notes to refresh the recollection of the juror who takes them, and who may refer to these notes that he took in the course of the trial, can have any more effect upon the rights of the accused than the mere argument of one juror who has a more retentive mind than the others would have. This constitutional provision certainly and obviously does not mean that after the jury goes into its deliberations that the accused has the right to be present and argue with the jurors as they state the evidence as they view it. Such a conclusion in our judgment would be

farcical because it would mean that no jury trial could stand because the defendant is never present in the jury room while the jury is debating the case that has been heard.

In support of the petitioners' argument, the case of *Wade v. State,* 12 Ga. 25, is cited, and it is said that the holding of that case makes it logical to hold that notes taken by a juror and read in the jury room violates the constitutional rights of the accused. In the Wade case the jury returned from its deliberations while the defendant was absent, and asked the court to read certain testimony to them, which testimony was taken by the court and not by a court reporter. Such was done, and the Supreme Court of Georgia held that the defendant's rights had been violated and that by the court reading this testimony back to the jury this constituted reversible error. This is an extreme minority view.

The Supreme Court of Georgia in later cases, *Green v. State,* 122 Ga. 169, 50 S.E. 53, and *Dozier v. State,* 26 Ga. 156, did not follow this rule. It is easy for us to see what probably constituted the conclusion by the Georgia court in the Wade case. There the court read its notes to the jury which had not been taken by a court reporter; it is probable under such circumstances the court might have emphasized one part of the evidence over another or things of the kind. This argument fails when based on what one juror says to another with reference to the weight he gives to certain evidence while another juror may give it a different weight, and this certainly does not give the accused the right to be present in the jury room and hear what the different jurors say and the conclusions that they have drawn from the evidence heard. Such a right is purely for those within the four walls of

the jury room, and there is absolutely no right of the accused to be present therein and hear such a debate. If we reached such a conclusion, we would do away with jury trials entirely.

The question of whether or not the court may order the court reporter to read certain portions of the transcript back to the jury, or read part of his notes to them, is not an issue herein.

We have very thoughtfully and carefully considered this matter and feel that there is no error herein, and, consequently, the petition to rehear must be denied.