IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 30, 2003

## STATE OF TENNESSEE v. SHAWN RAFAEL BOUGH

**Direct Appeal from the Criminal Court for Knox County**
**No. 68041    Richard R. Baumgartner, Judge**

_____

**No. E2004-02928-CCA-RM-CD - Filed January 19, 2005**

_____

This case presents an appeal to this Court after remand by order of the Tennessee Supreme Court. The appellant, Shawn Rafael Bough, was convicted by a Knox County Jury of felony murder and especially aggravated robbery. The original opinion of this Court in this matter was released on January 12, 2004, and the appellant filed an application for permission to appeal. See State v. Shawn Rafael Bough, No. E2002-00717-CCA-R3-CD, 2004 WL 50798 (Tenn. Crim. App. at Knoxville, Jan. 12, 2004), affirmed in part, reversed in part, and remanded by State v. Bough, ___ S.W.3d ___, 2004 WL 2481367. The supreme court granted the permission to appeal on May 24, 2004. In our original opinion, we determined that (1) because the appellant's first motion for new trial was not timely filed in regards to the felony murder conviction and an untimely notice of appeal resulted, the appellant waived all issues except for sufficiency of the evidence in regards to the felony murder conviction; (2) because the appellant's amended motion for new trial and second amended motion for new trial were likewise deemed untimely by this Court, the only other issues remaining were those raised in the initial motion for new trial that relate to the conviction for especially aggravated robbery. As a result of the procedural determinations, we addressed the following issues in regards to the conviction for especially aggravated robbery on direct appeal: (1) whether the trial court erred in allowing the State to comment on the appellant's failure to produce a witness; (2) whether the evidence was insufficient to support the conviction for especially aggravated robbery; and (3) whether the trial court erred in failing to instruct the jury regarding the corroboration of accomplice testimony and out-of-court confessions. As a result, we concluded that the evidence was sufficient to sustain the convictions. Further, we could find no error requiring reversal of the judgments of the trial court. The supreme court determined on appeal that the original motion for new trial, as well as the two amended motions for new trial, were timely filed as to both convictions, effectively affirming in part, reversing in part, and remanding the case to this Court for consideration of the issues that were pretermitted by our procedural rulings in the original opinion. See State v. Bough, ___ S.W.3d ___, 2004 WL 2481367 (Tenn. 2004). The following issues were not addressed by this Court due to our determination that the motion for new trial was untimely as to the appellant's felony-murder conviction and thus must be addressed on remand: (1) whether the trial court erred in allowing the State to comment on the appellant's failure to produce a witness; and (2) whether the trial court erred in failing to instruct the jury regarding the corroboration of accomplice testimony

and out-of-court confessions. The following issues were pretermitted on direct appeal by our conclusion that the amended motion for new trial was untimely: (1) whether the trial court erred by admitting the 911 tape of the victim; (2) whether the trial court erred in allowing jurors to take notes and ordered the notes to be destroyed prior to deliberation; (3) whether the trial court erred in allowing the State to exhibit the appellant and the co-defendant to the jury shortly before the 911 tape was played; (4) whether the trial court erred in allowing the State to infer criminal conduct of the appellant due to his association with known criminals and drug dealers. After consideration of these remaining issues, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Mark E. Stephens, District Public Defender and John Halstead, Assistant Public Defender for the appellant, Shawn Rafeal Bough.

Paul G. Summers, Attorney General & Reporter; Thomas E. Williams, Assistant Attorney General; Randall E. Nichols, District Attorney General; and G. Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

We include the facts as set forth in our opinion in the original appeal:

On December 19, 1998, the students at Knoxville College started their winter break. They were required to vacate student housing until the spring semester. Two sisters from New Jersey, Deanna and Edie Jones, were students at Knoxville College at the time. After packing up their belongings, the two were picked up by a friend and his brother. They dropped off some of their possessions at the apartment of Edgar Johnson, Edie Jones's boyfriend, which was located in Ridgebrook housing development, and made plans for the remainder of the evening. Edie and Deanna Jones planned to stay the night in Knoxville before catching their flight home the following morning.

After going to the store to get alcohol and snacks, the sisters and their two friends stopped at a liquor store. The party then went to the Expo Inn off of Ailor Avenue in Knoxville where Edie Jones rented room 207 for the night. Room 207 was located directly above yet slightly behind the hotel's lobby and front desk area.

Terry Williams was the employee on duty when Edie Jones and her sister checked-in to the Expo Inn.

While checking-in to the hotel, Deanna Jones saw the appellant and co-defendant, Craig Shears, in the parking lot and invited them to come up to their room later on that evening. Deanna and Edie Jones knew both the appellant and Craig Shears because they were students at Knoxville College. The two sisters, the friend, and the friend's brother hung out in the room, drinking alcohol and smoking marijuana. At some point, Deanna Jones fell asleep. While she was asleep, the friend and his brother left the hotel room for the night.

Montes Best relieved Terry Williams at the front desk of the hotel at approximately 11:00 p.m. Montes Best worked at the Expo Inn until around seven-thirty a.m. the next morning and was working at the desk when two African-American men who claimed to be looking for a friend in room 207 approached the locked front doors late at night. Deanna and Edie Jones remember the defendant, co-defendant and another male student stopping by room 207 for a few minutes before midnight. The appellant and Craig Shears stopped by again after midnight, asking to use the telephone. The appellant used the telephone to call several airlines. He attempted to secure a flight from Tennessee through Chicago to California, his home state. Deanna Jones was in the restroom during part of the appellant's telephone conversation, but was able to hear most of what the appellant was saying on the telephone. When she exited the bathroom, she noticed a gun underneath the corner of the bed where the appellant was sitting. She told the appellant not to forget his gun; he thanked her and put the gun in his sock. At that time, the appellant and Craig Shears left the room.

Sometime after midnight, the appellant and Craig Shears again returned to room 207 for the third time, again to use the telephone. Deanna Jones heard the appellant ask the person on the other end of the phone about getting a ride. Edie was asleep. The two men left the room after the phone call.

The appellant and Craig Shears came back to room 207 for a fourth and final time to tell Deanna and Edie Jones that they were leaving. At trial, Deanna Jones testified that it was "still dark" when the two men left the hotel room for the last time. However, the statement she gave to the police on the day of the incident indicates that the two left the hotel room around 9:00 a.m. on December 20, 1998.

During the course of the evening, Deanna Jones drank approximately five cups of a punch made from liquor and smoked a marijuana "blunt" the size of a small cigar that she shared with everyone in the room. Edie Jones smoked approximately two to three marijuana "blunts" with her friend and his brother and drank a small

amount of alcohol. She complained of a head cold and claimed to sleep a great deal of the evening.

Montes Best, the desk clerk, spoke with Billy Oldham, the person responsible for relieving her post, via telephone the morning of December 20, 1998. He gave her permission to lock up and go home before he arrived at the hotel between eight and eight-thirty a.m.

When Edie Jones woke up early on the morning of December 20, 1998, she could not find matches or a lighter to light a cigarette, so she walked down to the lobby/front desk area of the hotel to see if she could get a light for her cigarette. She spoke with the gentleman in the lobby, Billy Oldham. He offered her a cup of coffee. She declined, looked at several of the fliers on the bulletin board in the lobby, and headed back upstairs to get ready for her flight. Around ten a.m., Deanna and Edie heard something downstairs in the lobby area like three or four gunshots.
Just after ten a.m. on December 20, 1998, officers of the Knoxville Police Department were dispatched to the Expo Inn in response to a 9-1-1 call from the hotel's clerk that there had been a robbery and shooting. According to the victim, Billy Oldham, two tall, thin black males from room 207 demanded money and shot him. According to the Knoxville County Medical Examiner, the victim died as a result of complications from multiple gun shot wounds. The victim was shot four times, once in the chest under the right arm, once in the upper left back, and once in each side of the lower back.

Dante Smith picked up the appellant and Craig Shears at the Expo Inn shortly after ten a.m. on December 20, 1998, after being called repeatedly by the appellant. Mr. Smith was Edgar Johnson's roommate.[1] He drove to the hotel where he saw the appellant and Craig Shears running out of the lobby. The appellant was carrying a plastic tub which contained envelopes. Dante Smith testified that:

> He [the appellant] was just talking a lot. He kept on saying something about he thinks he killed--or he thinks he shot somebody inside. He wasn't sure, but--he said he shot him, but he wasn't sure if he killed him or not. . . . He was saying something about, 'If you cut the phone lines, I did--I did the rest,' or, 'I was doing the rest,' or something like that.

Mr. Smith drove the two men towards Knoxville College where he stopped the car and asked them to get out because he "ha[d] never done anything like this." Mr. Smith then drove back to his apartment at Ridgebrook.

---

[1]Edgar Johnson was Edie Jones's boyfriend.

The appellant and Craig Shears later showed up at Mr. Smith's Ridgebrook apartment and started counting money from the plastic container they carried from the hotel. The appellant asked Mr. Smith if he would "hide the gun for him." Mr. Smith refused, asking the appellant if he was "crazy." The appellant also asked Mr. Smith to give the two a ride to the bus stop or airport. Again, Mr. Smith refused. The appellant and Craig Shears left $25-30 for Mr. Smith. He did not take the money, but gave it to someone who needed the money to travel home for the holidays. Investigator A.J. Loeffler arrived at the Expo Inn around 10:15 a .m. Almost immediately, he got into the ambulance with the victim. The victim was "gasping for air" and kept saying "I'm losing it. I am going out. I am losing it." The victim stated that he "was working the desk, and two guys came in from room 207, asked me for my money, and then shot me." The victim described the perpetrators as "two black males, tall, slender" with "a little bit of facial hair." He told Officer Loeffler that he thought that the two men got into a "brown Japanese model" car. That car was later identified as the car of Rayetta Woodruff.

After interviewing the victim, Officer Loeffler went back to the Expo Inn to observe the scene of the incident and collect more information. He noted that the telephone lines in the lobby were cut as well as those in the adjacent offices of rooms 105 and 106. The crime scene specialist, Joe Cox, found three federal .22 long rifle cartridge cases behind the front desk and two cartridge cases located elsewhere in the lobby area. The detail tape on the cash register indicated that the "no-sale" button was pushed at 10:03 a.m. on December 20, 1998.

After inspecting the scene of the crime, Officer Loeffler proceeded to interview Deanna and Edie Jones. He took the two women to the bus station and airport, hoping that they could identify the appellant and Craig Shears. Officer Loeffler located a reservation on Greyhound for Craig Shears to Chicago at 7 p.m. on December 20, 1998. Officer Loeffler boarded the bus, but did not find Craig Shears on board.

According to an employee with American Eagle Airlines in Knoxville, the guest passenger list from a flight from Nashville to Chicago on December 20, 1998 contained the names of the appellant and Craig Shears and showed that the two men were seated in seats 23A and 23B. The reservations indicated that the tickets were purchased at the same time. The appellant called Mr. Smith in January of 1999. He asked Mr. Smith if he talked to the police about the incident. Mr. Smith told the appellant he had not spoken with the police. A few months later, Mr. Smith talked to several detectives regarding his knowledge of the incident.

Isaiah Dixon has known the appellant since they were eleven years old. They lived near each other in San Francisco and attended school together. Mr. Dixon saw the appellant in California sometime after the December incident when the appellant

-5-

told Mr. Dixon that he was on bail for a homicide charge in Tennessee. Mr. Dixon stated that the appellant "told me that he was trying to pull a heist, and there was [sic] things that went wrong. . . . The man was taking too long, so he let him have it." Mr. Dixon also stated the appellant "let him [the clerk] have it" because "he was taking too much time to open the safe. He was stalling." The appellant told Mr. Dixon that he got a "couple thousand" in the heist, but that "he had went [sic] to jail shortly after that for like a warrant or something, and when he had got [sic] back to school, all the money wasn't there." At the time of trial, Mr. Dixon was incarcerated in a California prison as a result of a guilty plea for second degree burglary.

On May 6, 1999, the Knox County Grand Jury returned a multiple-count indictment against the appellant and Craig Shears for one count of first degree murder, one count of felony murder, and one count of especially aggravated robbery.

The appellant was arrested on May 9, 1999, at his mother's home in San Francisco, California. On May 8, 1999, Lisa Curry with the San Francisco Police Department phoned the appellant's home posing as Deanna Jones. She was told where to find the appellant and instructed to call back the next day. On May 9, 1999, the police surrounded the house shortly before Officer Curry phoned the appellant, again posing as Deanna Jones. The appellant was apprehended at the back door of the residence.

Officer Loeffler was present during the arrest and recorded a conversation with the appellant later that day. During the conversation, the appellant indicated that he stayed at "a hotel" with "Deanna and Edie" the night he vacated the dorms for Christmas break and "left in the morning . . . about 9:30." He stated that "the home boy gave me a ride to Nashville. I took my plane from there." He told Officer Loeffler that the guy who gave him and Craig Shears a ride was named "Ted" and that he drove a van. According to the appellant, "Ted" was a guy who "just come [sic] up to the school, you know . . . he just give [sic] us rides and stuff so I asked him could he give me a ride . . . the night before . . . he said alright, I'll be there." He stated that "Ted" picked him and Craig Shears up at around 9:00 or 9:30 a.m. on December 20, 1998 and took them straight to Nashville where he dropped them off at the airport after making sure their flights were not delayed.

State v. Shawn Rafael Bough, 2004 WL 50798, at *1-*6. Following a jury trial, the appellant was found not guilty of first-degree premeditated murder, but guilty of felony murder and especially aggravated robbery.

Analysis

We begin our analysis by addressing those issues in our original opinion that were not applied to the felony murder conviction due to our determination that the motion for new trial was untimely. We see no reason that the analysis applied therein to the conviction for especially aggravated robbery

would be different when applied to the conviction for felony murder. Accordingly, we adopt the analysis in our original opinion as to those issues and conclude that: (1) while the State's reference to a "missing witness" during closing argument was improper, the error was harmless beyond a reasonable doubt; (2) the witnesses Deanna Jones, Edie Jones, and Dante Smith were not accomplices whose testimony required corroboration, and therefore the trial court did not err in failing to give a jury instruction on accomplice testimony; and (3) the appellant waived any objection to the testimony of Isaiah Dixon regarding the appellant's out-of-court confession by his failure to raise the issue at trial. See Bough, 2004 WL 50798, at *6-*14.

## Introduction of the 911 Tape

The appellant complains that the trial court erred in admitting hearsay testimony of the victim in the form of the 911 tape. In this recording the victim, who has just been shot several times, states he is losing consciousness and fears he ". . . can't make it much longer . . .." In addition, during this telephone conversation the victim described his assailants as two tall thin black men staying in Room 207. Specifically, the appellant claims that these statements were not admissible as a dying declaration or an excited utterance and the prejudicial nature of the tape outweighs its probative value. The appellant contends that the trial court's decision to allow the introduction of the tape into evidence constituted plain error. The State disagrees, citing the appellant's failure to object to the introduction of the tape at trial.

First, we note that the appellant filed a motion in limine prior to trial attempting to exclude the 911 tape from evidence. However, there is nothing in the record to suggest that the trial court ever addressed or ruled on the motion. Further, the Defendant never contemporaneously objected to the introduction of the tape or otherwise brought the unadjudicated motion in limine to the attention of the trial court. We think these circumstances amount to a waiver of this the issue on appeal. See Tenn. R. App. P. 36(a); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988); Accordingly, we find no error. See State v. Larry Eldon Shannon, No. M2000-00985-CCA-R3CD, 2001 WL 846030, at *9 (Tenn. Crim. App. at Nashville, July 27, 2001), perm. to appeal denied (Tenn. 2001).

Neither does the introduction of the 911 tape constitute plain error as argued by the appellant. In order to review an issue under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. See State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000); State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994); see also Tenn. R. Crim. P. 52(b). The record does not support a finding that the admission of the 911 tape was plain error. There is no breach of a clear and unequivocal rule of law by the trial court as alleged by the appellant. Without definitively addressing the issue, it is certainly more than arguable that the victim's statements were excited utterances, if not dying declarations. The record is clear that the appellant failed to object to the introduction of the tape and there is no evidence as to why the appellant waived the issue. This issue is without merit.

## Exhibition of Appellant to Jury

The appellant next contends that the trial court erred in allowing the State to exhibit him and the co-defendant to the jury prior to the playing of the 911 tape in which the victim described the perpetrators as two tall, thin black males. Specifically, the appellant argues in his brief that the "effect of the State's actions was to highlight and exploit the powerful emotion of the 911 tape" and that "the manner of exhibiting the appellant and the co-defendant to the jury three minutes before the 911 tape was the practical equivalent of a show-up identification." The appellant cites State v. Collins, 986 S.W.2d 13 (Tenn. Crim. App. 1998), State v. Nesbit, 978 S.W.2d 872 (Tenn. 1988), and State v. Jackson, 52 S.W.3d 661 (Tenn. Crim. App. 2001), to support his argument that the tape was extremely emotional testimony that should have been excluded, comparing it to autopsy photos and victim impact evidence. The State argues that the appellant was not unfairly prejudiced.

Although the appellant frames this issue as one of wrongfully exhibiting the accused to the jury, his argument focuses on the emotional impact of the 911 tape and its prejudicial nature. The case herein is readily distinguishable from the cases relied upon by the appellant to support his argument. In State v. Collins, this Court determined that autopsy photographs of a murdered infant were cumulative and more prejudicial than probative where there was extensive medical testimony as to the cause of death of the infant. 986 S.W.2d at 20; see also Jackson, 52 S.W.3d at 668-69 (determining that cumulative evidence of a prejudicial nature should be excluded). The conversation on the tape was not cumulative as the tape contained details that the victim did not disclose to Detective Loeffler upon his arrival. Further, the tape did not consist of "[evidence] regarding the emotional impact of the murder on the victim's family." Nesbit, 978 S.W.2d at 891. Lastly, playing the tape was helpful in establishing the reliability of the victim's statements to Detective Loeffler and was not primarily intended to "elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror." Collins, 986 S.W.2d at 20. While the State's trial strategy of exhibiting the appellant to the jury in light of the description given by the victim was most likely unfavorable to the appellant's case, there is no indication that it was unfairly prejudicial. This issue is without merit.

## Jury Notes

The appellant argues that the trial court erred in permitting the jurors to take notes at trial. Specifically, he argues that the "problem in this case comes from allowing the jurors to take notes, but then ordering the notes to be destroyed." The State argues that because the destruction of the notes made any prejudice to the appellant impossible, the appellant's claim is without merit.

The trial court has the discretion to allow jurors to take notes during the course of a trial. Watkins v. State, 393 S.W.2d 141, 147 (Tenn. 1965); State v. Chance, 778 S.W.2d 457, 462 (Tenn. Crim. App. 1989). A defendant is not entitled to relief in that regard unless there is a showing of prejudice. Watkins, 393 S.W.2d at 149. In the case herein, the trial court permitted the jury to take notes during the presentation of proof. At the conclusion of the proof, but prior to deliberation, the trial court ordered the notes destroyed . Initially, defense counsel objected to the taking of notes by

the jury and requested that the notes be sealed for review on appeal. The trial court refused that request and ordered the notes destroyed. The appellant has failed to show how the trial court's decision to allow the jury to take notes or the decision to order destruction of the notes prejudiced his defense. Considering the appellant's inability to show prejudice, we find that the trial court did not abuse its discretion. See State v. James Alfonso Vaughn, No. 01C01-9612-CR-00523, 1998 WL 255438, at *10 (Tenn. Crim. App. at Nashville, May 21, 1998), perm. to appeal denied (Tenn. 1999). This issue is without merit.

## Improper Argument

The appellant argues on appeal that he is entitled to a new trial because the prosecutor stated during closing argument that "birds of a feather flock together" in response to attempts by defense counsel to impeach the State's witnesses with allegations of various forms of illicit behavior. While the appellant admits that he failed to object to the prosecutor's statements at trial, he argues that the trial court committed plain error by allowing the statements to be made. The State counters that the appellant waived the issue by failing to object at trial, and, in the alternative, that the prosecutor's statement was not "plainly improper" such that it would have required a curative instruction.

In general, the scope of closing argument is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). However, "argument must be temperate, . . . predicated on evidence introduced during the trial," and relevant to the issues being tried. State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994). Thus, the State must not engage in argument designed to inflame the jurors and should restrict its comments to matters properly in evidence at trial. State v. Hall, 976 S.W.2d 121, 158 (Tenn. 1998).

When a reviewing court finds improper argument, State v. Philpott, 882 S.W.2d 394 (Tenn. Crim. App. 1994), sets out five factors to determine "whether a prosecutor's improper conduct could have affected the verdict to the prejudice of the defendant." Id. at 408. The factors are: (1) the conduct complained of in light of the facts and circumstances of the case; (2) the curative measures undertaken; (3) the intent of the prosecutor in making the improper remarks; (4) the cumulative effect of the improper conduct and any other errors in the record; and, (5) the relative strength or weakness of the case. Id. (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The State has correctly noted that the appellant failed to lodge a contemporaneous objection to any of the comments about which he complains on appeal. Typically, the failure to object to the statement at trial results in a waiver on appeal of any complaint concerning the prosecutor's comments. Tenn. R. App. P. 36(a); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Thus, if this Court is to review the claims of prosecution misconduct we must do so through the process of "plain error" review embodied in Tenn. R. Crim. P. 52(b) which provides:

An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.[2]

This Court has, in its discretion, from time to time reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. See, e.g., State v. Marshall, 870 S.W.2d 532 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Carter, 988 S.W.2d 145 (Tenn. 1999) (determining in absence of objection that prosecutor's jury argument was not plain error); State v. Butler, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); Anglin v. State, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant).

In exercising our discretion as to whether plain error review under Tennessee Rule of Criminal Procedure 52(b) is appropriate, the Tennessee Supreme Court has directed that we examine five factors, all of which must be present in a case in order for review under Rule 52(b) to be appropriate. As noted previously, these five factors are as follows: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing Adkisson, 899 S.W.2d at 641).

For a "substantial right" of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings. United States v. Olano, 507 U.S. 725, 732-37 (1993) (analyzing the substantially similar Federal Rule of Criminal Procedure (b)); Adkisson, 899 S.W.2d at 642. This is the same type of inquiry as the harmless error analysis under Tennessee Rule of Appellate Procedure 36(b), but the appellant bears the burden of persuasion with respect to plain error claims. Olano, 507 U.S. at 732-37.

In the case herein we are not persuaded that the appellant has successfully carried his burden of persuasion in establishing a plain error claim. First, the record is clear as to what happened in the trial court. In closing argument the prosecutor recapped the testimony at trial, including that of Isaiah Dixon, who testified that the appellant confessed his involvement in the crime to him. During cross-examination, Mr. Dixon admitted that he had a substantial criminal record and that he was

---

[2]This rule by its terms allows plain error review only where there is a failure to allege error in the new trial motion or where the error is not raised before the appellate court. Nevertheless the rule has been interpreted by the appellate courts to allow appellate review under some circumstances in the absence of a contemporaneous objection as well.

seeking leniency by testifying against the appellant. Mr. Dixon also admitted to using and selling cocaine and marijuana. The prosecutor stated:

> Now, does Isaiah Dixon have something to gain? Of course, he does. I am not going to stand up here and tell you differently. Of course he does. He is trying to help himself out on some burglary charges, on some dope charges that he has got. What does . . . [defense counsel] do once again? "You take ecstacy; you sell ecstacy. You take marijuana; you sell marijuana. You take cocaine; you sell cocaine."

> Didn't bother him [the appellant] enough not to be his friend now, did it? But, oh, don't you believe him, because he is that kind of person. Well, birds of a feather flock together.

In rebuttal argument, after further recapping all of the testimony implicating the appellant and responding to defense counsel's argument that all of the witnesses against the appellant were lying, the prosecutor stated:

> You know, we want to have our cake and eat it, too, and bash all of these people and talk about what terrible, terrible awful people they are. But who is friends with them? Him [the appellant]. You can't have your cake and eat it, too.

> I am going to ask you why - - why in the world and how in the world - - he is trying to convince you that not one, not two, not three, but four different people came into this courtroom and lied on him, took that stand and raised their right hand and lied on him, and nothing contradicts what they have said that you have heard from there. The only thing that contradicts them is . . . [defense counsel's] fertile imagination.

Although the manner in which these points were made arguably crosses the line into improper expressions of opinion or personal belief as to the credibility of witnesses, no clear and unequivocal rule of law has been breached. Further, what is or is not improper rebuttal argument may very well vary depending on the context in which it was made. See Judge, 539 S.W.2d at 343 (Tenn. Crim. App. 1976) (holding that propriety of prosecution comments must be evaluated in light of whether they were in direct response to defense argument rather than gratuitous); see also Goltz, 111 S.W.3d at 6. The same might be said of the prosecutor's remarks commenting on the illegal activities of some of the witnesses and whether or not they were lying during their testimony. The statements were made in direct response to defense arguments that the prosecution witnesses were lying on the stand.

Next it is impossible to say whether the complained of comments adversely affected the jury's verdict in this case and whether consideration of this issue is necessary to do substantial justice. It should be noted again that the burden of persuasion on appeal is on the appellant to demonstrate that the prosecutor's comments "more probably than not affected the judgment or would

-11-

result in prejudice to the judicial process." Olano, 507 U.S. at 732-37; Tenn. R. App. P. 36(b). Other than the bare assertion that the prosecutor's comments deprived the appellant of a fair trial because it was a "close case," there is no indication that the jury was unduly swayed from its duties as explained in the jury instructions.

Finally, and perhaps most importantly, there is no excuse or explanation proffered by the appellant either in the record or in his brief on appeal as to the reason for his failure to object to the allegedly offending comments. Thus, we cannot say that the failure to object was for reasons other than tactical. Under these circumstances we are of the opinion that the appellant has failed to carry his burden of persuasion in convincing this Court to consider as plain error the propriety of the allegedly improper comments of the prosecutor in closing and rebuttal. This issue is therefore waived.

## Cumulative Effect of Error

Lastly, the appellant broadly argues that even if none of his claimed errors are by themselves enough to provide relief, their cumulative effect mandates a new trial. In support of his argument, the appellant cites State v. Zimmerman, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1991) and State v. Brewer, 932 S.W.2d 1, 28 (Tenn. Crim. App. 1996). Because we determine that there is no error, cumulative or otherwise, this issue is without merit.

## Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE